**HORIZON HOUSE DEVELOPMENTAL SERVICES, INC., Plaintiff,**

v.

**TOWNSHIP OF UPPER SOUTHAMPTON, et al., Defendants.**

No. 89–2243.

United States District Court, E.D. Pennsylvania.

Aug. 28, 1992.

Brian A. Gordon, Gordon & Gordon, P.C., Philadelphia, Pa., Beth Pepper, Mental Health Law Project, Washington, D.C., for plaintiff.

D. Barry Gibbons, Palmer & Proud, P.C., Media, Pa., for defendants.

## OMNIBUS FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FINAL ADJUDICATION

LOWELL A. REED, Jr., District Judge.

Plaintiff Horizon House brought this action against defendants seeking a declaration that the provision of Ordinance No. 300, imposing a distance requirement of 1000 feet for group homes within the township of Upper Southampton, discriminates against people with handicaps in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, as amended by the Fair Housing Amendments Act of 1988 [hereinafter FHAA], and the equal protection clause of

the United States Constitution, and seeking to enjoin the Township from enforcement of the ordinance.

After a nonjury trial and for the reasons set forth in the following findings of facts and conclusions of law, I conclude that the distance requirement contained in Ordinance No. 300 is facially discriminatory in violation of the FHAA, constitutes an equal protection deprivation, and alternatively, has an unlawful and unconstitutional discriminatory effect. I will grant plaintiff's request to enjoin the enforcement of the ordinance.

Based upon the testimony, exhibits and stipulations at the trial, I make the following findings of fact and conclusions of law.[1]

## I. FINDINGS OF FACT

### A. *Status of the Horizon House Homes under Ordinance No. 300*

1. Horizon House Developmental Services, Inc., is a non-profit Pennsylvania corporation, that provides residential services to people with mental retardation. Agreed Upon Stipulation of Facts (Document No. 75) ("Stip.") ¶¶ 8 & 9.

2. Since 1952, Horizon House has developed a total of fifteen group homes [2] in the Commonwealth of Pennsylvania. These are located in Montgomery County, Bucks County, and Philadelphia. Testimony of Wayne Chiodo, Chief Executive Officer of Horizon House ("Chiodo").

3. In addition to developing group homes in single-family dwellings, Horizon House developed housing in a Philadelphia apartment building for three years. Horizon House provides the apartment dwellers with supervision and other support, according to individual needs. Testimony of Chiodo. There is no evidence that the residents

there have had a negative impact on others residents in the building.

4. On April 20, 1988 Horizon House leased two houses in a single family residential area in Upper Southampton Township to provide housing for people with mental retardation. The two group homes are located at 941 Maple Drive and 906 Hillside Drive, respectively. Stip. ¶ 10.

5. Professionally trained staff are available twenty-four hours a day to assist the residents in these homes. Testimony of Chiodo.

6. The three residents at the 941 Maple Drive home moved into their home in September, 1988. The three residents at the 906 Hillside Drive home moved into their home in January, 1989. Testimony of Chiodo.

7. After having been in an institution for many years, the residents in these homes have acclimated well to living in the community. They relate to each other like members of a family. Testimony of Chiodo and Joann DeMassio, Resident Advisor ("DeMassio").

8. The Horizon House homes blend into the neighborhood. They are indistinguishable from other homes on the block. They appear well maintained. Testimony of Demassio & Plaintiff's Trial Exhibits 48(A)–(B).

9. There is no evidence that either home, individually or collectively, has had any negative impact on the neighborhood in terms of noise, or other like disturbances; nor that the homes imposed any greater burden on public resources, such as public transportation, than any other single family dwelling in the neighborhoods in which they are located. Testimonies of Demassio and Phillip Fenster, Administrator of Bucks County Office of Mental Health and Mental Retardation ("Fenster").

---

1. To the extent that any finding of fact or conclusion of law contains mixed findings of fact and conclusions of law, they are intended to comply with the legal requirements of Fed. R.Civ.P. 52.

2. A group home or community home is a living arrangement where one or more people with

mental retardation live as a family with supervision and other supports in permanent homes. There are 2,500 group homes in the Commonwealth for people with mental retardation. Testimony of Nancy Thaler, Director of the Bureau of Community Programs for the Commonwealth of Pennsylvania ("Thaler").

10. People with a physical or mental impairment that substantially limits one or more major life activities are handicapped within the meaning of the FHAA.

11. People with handicaps often require permanent care or professional supervision. Testimony of Thaler.

12. The residents of the Horizon House homes are "handicapped" within the definition of the Fair Housing Act, 42 U.S.C. § 3602(h).

13. The two Horizon House homes are situated 800 feet apart from each other within the Upper Southampton Township. Testimonies of Chiodo and Professor Elaine Bosowski, Department of Geography at Villanova ("Bosowski").

14. The two Horizon House homes do not have a variance from the spacing requirement of Ordinance No. 300. Testimony of Chiodo.

### B. The History of Ordinance No. 300

15. Ordinance No. 300 is the fourth in a series of ordinances passed by the Township relating to group homes.

#### 1. Ordinance No. 261

16. The first effort to exclude or limit the homes through a spacing requirement occurred in 1988. Testimony of Chiodo.

17. In the summer of 1988, Horizon House sought to open two group homes in the Township. At that time, the Township had no spacing requirement or any other restriction or regulation on housing for people with handicaps or other group homes. Stip. ¶¶ 12 & 13.

18. After Horizon House announced its intention to open up the homes, there was overwhelming community opposition to them. Testimony of Fenster. Many neighbors and some Township Supervisors expressed hostility toward Horizon House. Testimonies of Chiodo and Fenster. It was a classic case of "NIMBY", which is the acronym for the colloquial expression "not in my backyard." Testimony of William Kerins, Township Supervisor ("Kerins").

19. At a public meeting held before the Board of Township Supervisors on August 16, 1988, approximately 70 residents out of about 150 attendees, submitted a petition to the Township Board to stop Horizon House and its clients from moving into the neighborhood. Plaintiff's Trial Exhibit 6 & Stip. ¶¶ 14, 15 & 16.

20. Many residents at the public meeting expressed their concern that property values would decline and their children would be unsafe. Deposition Testimony ("Dep.") of Charles Martin, Township Supervisor at 9–11, Dep. of John Held, Township Supervisor at 9–10, Dep. of Gerald Crandley, Township Supervisor at 7–9. Some neighbors expressed concern that the character of their neighborhood would change or that they objected to the presence of people with mental retardation living in the community. Plaintiff's Trial Exhibit 5 & Stip. ¶ 17.

21. Initially, the Supervisors responded to the community opposition by directing their Township Manager, Robert Pellegrino, to inquire at the office of the Township Solicitor as to whether the zoning code treated a group home as a nursing home. Plaintiff's Trial Exhibit 8 & Stip. ¶ 18.

22. At a meeting of the Township Board of Supervisors on September 6, 1988, the Township Solicitor advised Pellegrino and the Supervisors that, under Pennsylvania law, a group home was classified under the definition of "family" and could not be regulated as an institutional use, such as a nursing home. Stip. ¶ 19 & Plaintiff's Trial Exhibit 10.

23. The Board then directed Pellegrino to draft an ordinance governing group homes for handicapped persons. Plaintiff's Trial Exhibit 10 & Stip. ¶ 20).

24. Pellegrino prepared a first draft on September 8, 1988. Plaintiff's Trial Exhibits 11, & 74; Dep. of Pellegrino I at 82–83. In this draft, entitled "GROUP HOME FOR MENTALLY RETARDED PERSONS," group homes were defined as "any facility providing residential services to persons who due to *age, disability,* or *handicap* are not able to live without *long term or permanent care or supervision provided by professionals ...*" Plaintiff's Trial Exhibit 11 (emphasis added). Also in

the draft and in addition to many other restrictions, was the requirement that group homes for "the mentally retarded" be 2,000 feet apart from each other and secure a conditional use permit.

25. On September 15, 1988, Pellegrino submitted the draft to the Board. Plaintiff's Trial exhibits 13 & 74 at 83 & Stip. ¶ 22.

26. On October 4, the Township held a public meeting to consider the proposed group home ordinance. Stip. ¶ 24 & Plaintiff's Trial Exhibit 15. At that meeting, Chris Shubert, a lawyer representing members of the community opposed to the homes, proposed that the coverage of the ordinance go beyond group homes for mentally retarded people and cover group homes for other types of disabled people, including people with physical disabilities and developmental disabilities. Plaintiff's Exhibit 74 at 41–42 & Stip. ¶ 25.

27. Pellegrino marked up his draft of the proposed ordinance incorporating Shubert's recommendations by inserting the words "physical disabilities" and "developmental disabilities" into the definitional section and changing the title of the ordinance from "GROUP HOME FOR THE MENTALLY RETARDED" to "FAMILY CARE HOME FOR DISABLED PERSONS." Additionally, Pellegrino crossed out the number "2,000" for the spacing requirement, and replaced it with the number "3,000." Plaintiff's Trial Exhibit 51; see also, Plaintiff's Trial Exhibit 74 at 76, lines 7–24, and at 41–42).

28. The ordinance defined family care homes for disabled persons as "any facility providing residential services to persons due to age, physical disability, developmental disabilities or mental retardation [sic] are not able to live without long term or permanent care or supervision provided by professionals trained to provide such care."

29. The draft ordinance, including the new recommendations were approved and incorporated by the Board into the final version of the ordinance, which was enacted, on October 4, 1988, as Ordinance No. 261 Id.; see also, Plaintiff's Trial Exhibit 15 & Stip. ¶ 26.

30. Before voting on Ordinance No. 261, the Board did not hear from an expert on social services or mental retardation regarding the need and effect of such an ordinance.

31. Soon after the ordinance was passed, Pellegrino, who was also the Township zoning enforcement officer began to enforce Ordinance No. 261 against Horizon House. Pellegrino directed Horizon House to comply with the terms of the ordinance. The Township instructed Horizon House to apply for a use permit, and then, after that proved fruitless, the Township told Horizon House to apply for a variance from the Township Zoning Hearing Board. Testimony of Chiodo, & Plaintiff's Trial Exhibits 22, 23 & 38.

32. After a lengthy and costly proceeding, see Stip. ¶¶ 34–43, Horizon House's request for a variance was denied because its homes were within 3,000 feet of each other, in violation of Ordinance No. 261, and the Zoning Hearing Board concluded that Horizon House had not made a sufficient showing of hardship to obtain a variance. Plaintiff's Trial Exhibit 63.

33. To date, Horizon House has no variance for its two homes.

34. The Township enforced the terms of Ordinance No. 261 against Horizon House despite that one of its homes was occupied before the enactment of Ordinance No. 261.

35. This enforcement is in direct contrast to the argument of the Township at trial that the homes constitute a prior nonconforming use and are, therefore, insulated from enforcement action under any ordinance passed after the homes were occupied, in particular Ordinance No. 300.

36. This history is evidence which supports the finding that the current homes may not be treated as a prior non-conforming use under Ordinance No. 300, notwithstanding the Township's attestations to the contrary.

### 2. Ordinance No. 266

37. The second attempt to limit or exclude group homes occurred on May 2, 1989, when the Township enacted Ordi-

nance No. 266 as an amendment to Ordinance No. 261. Plaintiff's Trial Exhibit 2 & Stip. ¶ 44.

38. Ordinance No. 266 retained the same definition of "FAMILY CARE HOME" as in Ordinance No. 261, but included a different spacing requirement between group homes. The Township reduced the spacing requirement from 3,000 feet 261 to 2,500 feet. Stip. ¶ 45.

39. Despite the reduced distance requirement, Horizon House remained out of compliance with the zoning ordinance because the homes are 800 feet from one another, well within 2,500 feet. Consequently, the homes continued to remain at risk of being closed. Indeed, in June 1989, the Zoning Hearing Board denied Horizon House's request for a variance. Plaintiff's Trial Exhibit 65.

### 3. Ordinance No. 290

40. The third effort of the Township to limit or exclude group homes occurred on November 19, 1991 when the Township passed Ordinance No. 290. Plaintiff's Exhibit 3. This version was drafted by D. Barry Gibbons, Esquire, the defense attorney in the instant action. Plaintiff's Trial Exhibit 75 at 27, lines 7–18. Ordinance No. 290 repealed ordinances 266 and 261. Stip. ¶ 48.

41. Ordinance No. 290 was similar to its predecessors, Ordinance Nos. 266 and 261. Like Ordinance No. 266, ordinance 290 had a 2,500 foot distance rule. Like both Ordinance Nos. 266 and 261, Ordinance No. 290 was aimed at homes for people with handicaps. Plaintiff's Trial Exhibits 2, 3 & 75 at 33, lines 14–22.

42. The Horizon House homes continued to remain at risk of being closed under Ordinance No. 290 because they were within 2,500 feet of each other. Plaintiff's Trial Exhibit 75 at 51, lines 16–24.

43. Ordinance No. 290 differed from Ordinance Nos. 261 and 266 in its definition of "FAMILY CARE HOME." Ordinance No. 290 deleted all references to the types of disabilities covered which were specified in Ordinance Nos. 261 and 266.

44. The basic definition, however, contained in the original draft by Pellegrino's entitled "GROUP HOME FOR THE MENTALLY RETARDED" remained intact, i.e., Ordinance No. 290 would affect all facilities where "permanent care" or "professional supervision" was present.

45. In an apparent attempt at achieving facial neutrality in the ordinance by deleting all reference to disability, the Township, by the language of "permanent care and professional supervision", continues its policy of excluding people with disabilities. One Township Supervisor stated that Ordinance No. 290 was a "political compromise" cloaked in the appearance of lawfulness. Testimony of Kerins & Plaintiff's Trial Exhibit 75 at 26, line 10–22 & at 27, lines 7–18.

46. The Township, under advice of counsel in November 1991 was aware that legal problems existed using an explicit classification scheme. As a result the Township attempted to circumvent the civil rights laws by including a provision that appeared neutral. Indeed, both Pellegrino and Martin testified that Ordinance No. 290 was intended to restrict homes for people with disabilities in the same ways as the prior ordinances and was really no different from them. Plaintiff's Trial Exhibit 75 at 23, line 24 & page 24, line 7 & Plaintiff's Trial Exhibit 76 at 10, lines 16 & page 12, line 23.

### 4. Ordinance No. 300

47. Ordinance No. 300 is the fourth effort by the Township to limit or exclude people with handicaps from the Township. It is a direct outgrowth of Ordinance Nos. 261, 266, and 290.

48. On August 11, 1992, after this case had been assigned a trial date, Upper Southampton Township enacted Ordinance No. 300, which became effective on August 16, 1992, the day before the trial of this case commenced. Plaintiff's Trial Exhibit 79.

49. Ordinance No. 300 uses the same definition of FAMILY CARE HOME as in Ordinance No. 290, and, similar to Ordinance No. 290, attempts to convey the appearance of facial neutrality while continu-

ing to restrict homes for people with handicaps. Plaintiff's Trial Exhibit 79.

50. Like its predecessors, the spacing requirement in Ordinance No. 300 is grounded in community opposition, stereotyping and prejudice against people with handicaps. *See, e.g.,* Dep. of Frank Kautz, Township Supervisor ("Kautz"), at 6, lines 7 & at 7, line 17 (people "perceive" that "property values" will go down if group homes are within 1,000 feet of each other).

51. Ordinance No. 300 is aimed at the Horizon House homes and other housing for people with handicaps.

52. The Township's effort at neutrality fails on the face of the ordinance to achieve neutrality and effectively seeks to and does limit the number of people with handicaps that may a live in the Township.

53. A current Supervisor stated that he thought the ordinance was reasonable because even with a 1000 foot rule thirty group homes (or approximately 150 people with mental disabilities, on a ratio of three people per home) would still be able to live in the Township. He added that that amount was "enough" for a town like Upper Southampton, with a population of approximately 30,000. Testimony of Kerins.

54. The rationale offered by the Township for requiring group homes to be outside 1000 feet from each other is to avoid potential clustering of homes for people with mental retardation and to promote their integration into the neighborhood.

55. Defendants have provided no evidence in this record, nor was any presented to the Board of Supervisors before they passed Ordinance No. 300 regarding the effects of clustering or how the ordinance would promote integration to support the reasonableness and legitimacy of their proffered rationale.

56. Contrary to the proffered rationale, the two group homes established by Horizon House in the Township show that, two homes within 1,000 feet of each other do not rise to the level of a "ghetto" or clustering under any definition of these terms.

57. The Township's proffered reason, even if genuine, does not vitiate the ordinance's facial discriminatory treatment of people with handicaps and its discriminatory effect.

C. *The Meaning and Impact of the Spacing Requirement in Ordinance No. 300 on People with Handicaps*

58. Since 1972, the Commonwealth of Pennsylvania has promoted community-based living arrangements for people with mental retardation. In 1972 the Pennsylvania legislature appropriated money for community living arrangements, now referred to as group or community homes. Testimony of Nancy Thaler.

59. The Commonwealth, through the Bureau of Community Programs (an agency in the Office of Mental Retardation), seeks to support people with mental retardation in natural settings and in daily routines common to all people. The testimony of Director of the Bureau of Community Programs, Nancy Thaler, which I accept as credible, shows that the Bureau seeks to achieve this objective through policy development, funding mechanisms, and training for providers, consumers, and their families. Thaler explained that community living, as opposed to institutional life, provides people with mental retardation rich opportunities for growth and advancement.

60. The Bureau of Community Programs funds, promotes and develops a range of living options for people with mental retardation. These include group homes, support and services in traditional family arrangements, and support and services in non-traditional family arrangements. Testimony of Thaler. These arrangements exist in single-family dwellings as well as apartments. All involve professional support, and are permanent care settings.

61. The Commonwealth is currently looking toward the expansion of services and programs for people with mental retardation. There is a need for at least 1,500 new homes since more than 8,000 people are currently in inappropriate settings. Testimony of Thaler.

62. The 1000–foot spacing rule affects the entire range of housing options that are being developed for people with mental retardation, from group homes to shared apartment living. Because of the distance rule, it is impossible for a group home provider to open a home next to a family that may also be providing care to one or more individuals with mental retardation. Similarly, if two people with mental retardation are sharing an apartment and have some level of permanent care or professional supervision, the remainder of the apartment complex will be off limits to others with mental handicaps. Testimony of Thaler.

63. The 1,000–foot spacing rule can limit access to essential community and personal services to citizens with handicaps. A family care home existing on a main street in the Township, near public transportation or the supermarket, would preclude prospective residents of a group home from living in similar close proximity to these resources as a result of the 1000–foot rule. This would also be true of other community resources such as libraries and medical services. Testimony of Thaler and Bosowski.

64. A distance rule thwarts efforts treat people with mental retardation as equal members of a community and has a degrading effect such persons self-esteem and self worth. Testimony of Thaler.

65. Current professional opinion suggests that (1) people with handicaps should decide where they want to live and that zoning officials should not make these decisions for them, (2) people with disabilities should be able to live wherever they want to—if a person without a disability can live in an industrial area, then a person with a disability should be able to do so as well. Testimony of Thaler.

66. In Bucks County there are 480 people waiting for placement in appropriate settings in the community. Twenty-nine of those people have a documented and urgent need to move into group homes now. The County has funds for these programs in hand from the Commonwealth for fiscal year 1992–1993 to accommodate 13 individuals in supported living and family living settings, and 25 individuals in HUD § 8 set asides. All County programs involve professional supervision or permanent care. Testimony of Fenster.

67. Horizon House is in good standing with the Bucks County Office of Mental Health and Mental Retardation and is considered a prime qualified supplier of group home services. Horizon House would receive favorable consideration for a group home in Upper Southampton Township if it secured a home in that location. Testimony Fenster.

68. The 1000 foot distance requirement in Ordinance No. 300 hampers the ability of Bucks County to locate people with handicaps in individualized programs, *i.e.*, letting the client decide where or how to live. Testimony of Philip Fenster.

69. As a result of the spacing requirement set forth in Ordinance No. 300, Horizon House has specifically instructed its employees not to look at Upper Southampton as a site for new housing, despite new available funding from the Bucks County Department of Mental Health and Mental Retardation. Testimonies of Chiodo and Fenster.

## II. CONCLUSIONS OF LAW

### A. *Standing*

1. In order to establish standing the plaintiff must show that (1) the plaintiff suffered an "injury in fact" that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged action; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defender of Wildlife*, — U.S. ——, ——, 112 S.Ct. 2130, 2132, 119 L.Ed.2d 351 (1992). Plaintiff has satisfied each element of this test.

2. Section 3613(a) of the Fair Housing Act authorizes suit by "an aggrieved person." This term is defined in § 3602(i):

"Aggrieved person" includes any person who—

(1) claims to have been injured by a discriminatory housing practice; or

(2) believes that such person will be injured by a discriminatory housing practice that is about to occur.

3. The FHAA makes clear that providers have standing to challenge state or local laws that discriminate against them "because of the handicap" of the "person[s] residing in or intending to reside" in their group homes. 42 U.S.C. § 3604(f)(2)(B).[3]

4. Courts have explicitly held that a person who is not himself handicapped, but is prevented from providing housing for handicapped persons by a municipality's discriminatory acts, has standing to sue under the FHAA. *Baxter v. Belleville*, 720 F.Supp. 720, 730–31 (S.D.Ill.1989); *Marbrunak, Inc. v. City of Stow*, No. 5:90 CV 0925 (N.D.Ohio July 29, 1991).

5. It is clear that Horizon House has suffered a distinct and concrete injury satisfying the first element of standing. Horizon House has been injured because it is prevented and deterred from expanding housing in Upper Southampton Township solely because of the 1,000 foot spacing rule contained in Ordinance No. 300. This is evidenced by the decision of Horizon House not to look at Upper Southampton as a site for new housing, despite its favorable status as a provider and new available funding from the Bucks County Department of Mental Health and Mental Retardation. *See* Finding of Fact ¶¶ 66–69. Similar to the plaintiff's in *Baxter* and *Marbrunak*, Horizon is an "aggrieved person" entitled to maintain this action.

6. Horizon House has suffered other injuries in the past and continues to suffer injury as a result of the ordinance. Horizon House was injured by the initial ordinance drafted in direct response to the Horizon House homes for the purpose of excluding group homes from the Township. The discrimination continued with fluctuations in the distance requirement, each im-

permissibly limiting the amount of group homes to be developed in the Township. Horizon House continues to be injured by the ongoing exercise of power by the Township to restrict group homes for people with disabilities. Horizon House is in fear of its group homes being closed or having to defend against such efforts (even if unsuccessful), based upon the Township's past conduct, because the homes are currently in violation of the 1,000 foot rule and they have no variance.

7. A housing provider is not required to wait until a governmental entity enforces its rules against it before bringing suit; *see, e.g., Oxford House–Evergreen v. Plainfield*, 769 F.Supp. 1329 (D.N.J.1991) (provider seeks court's assistance in preventing a city from enforcing a discriminatory zoning rule); or, to seek a variance from the 1,000 foot distance rule before invoking the jurisdiction of this Court, when it knows from past history that such an effort would be futile. *See, e.g., Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447 (4th Cir.); *cert. denied,* —— U.S. ——, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990) (a party need not make futile gestures before being able to challenge a discriminatory housing practice).

8. Prior to the passage of the FHAA in 1988, the Supreme Court held that persons who had not themselves been unlawfully denied housing but had suffered injury as a result of discrimination against others had standing under the Fair Housing Act. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982) (fair housing group's efforts to achieve open housing were allegedly frustrated by discrimination); *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 103 n. 9, 109, 99 S.Ct. 1601, 1609 n. 9, 1612, 60 L.Ed.2d 66 (1979) (community was affected by alleged racial steering); *Trafficante v. Metropoli-*

---

3. In pertinent part § 3604(f)(2) makes it unlawful

To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

(A) that buyer or renter;
(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
(C) any person associated with that buyer or renter.

*tan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972) (white residents were harmed because their apartment complex allegedly excluded blacks). The language of the FHAA cited above and its legislative history supports the conclusion that § 3602(i) is consistent with the holdings of these cases. *See* House Report, at 40 ("The Committee intends that relief may be awarded to all persons affected by the discriminatory housing practice.").

9. It is not disputed that the challenged action, that is the distance requirement in Ordinance No. 300 is traceable to the injury. Horizon House has satisfied this element of standing.

10. Horizon House's injury will be remedied by a court decision in its favor thereby satisfying the final element of standing. If Horizon House is granted injunctive relief its existing homes will no longer be out of compliance with the spacing requirement or under threat of enforcement by the Township. Horizon House and its residents can then be assured of safety. If injunctive relief is granted, Horizon House will also be able resume housing development in Upper Southampton Township.

11. Defendants reliance on *Defender's of Wildlife, supra,* on the issue of standing is misplaced. In that case the Supreme Court distinguished between two types of plaintiffs. The first class of plaintiffs are directly the "object of government action." *Id.,* —— U.S. at ——, 112 S.Ct. at 2137. The court stated that as to those plaintiffs there is "ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." The second class of plaintiffs assert the injury of "some third party not involved in the case." In that circumstance, standing hinges on the "response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.*

12. Defendant is incorrect in its argument that Horizon House falls into the latter category. Rather, the FHAA provides Horizon House a direct cause of action as a provider of housing to persons with handicaps. Thus, because Horizon House is the "object of the action," and has suffered an injury clearly traceable to that action, and will be remedied if they receive a favorable decision, they have standing under *Wildlife.*

13. In sum, Horizon House has showed the requisite injury to sustain standing here.

### B. *FHAA Standard*

14. The FHAA makes it unlawful to discriminate against a person based on handicap with respect to housing. 42 U.S.C. § 3604(f)(2). An ordinance that uses a discriminatory classifications is unlawful in all but rare circumstances. A violation of the FHAA can be established by demonstrating that the challenged statute is discriminates against the handicap on its face and serves no legitimate government interest. A violation of the FHAA may also be established by demonstrating a "disparate treatment", which occurs when the "the defendant was motivated by an intent to discriminate because of a handicap", or by demonstrating a "disparate impact" which requires the plaintiff to prove, "absent a discriminatory intent on the part of the defendant, the effects of defendant's actions were nonetheless discriminatory." *United States v. Schuylkill Township,* No. 90–2165, 1990 WL 180980, at *6, 1990 U.S.Dist. LEXIS 15555, at *18, (E.D.Pa. November 16, 1990); *reconsideration denied,* 1991 WL 437, 1991 U.S.Dist. LEXIS 2 (E.D.Pa.1991).

15. Plaintiff has proved that the 1000 foot distance requirement is facially invalid. Alternatively, plaintiff has proved a violation of the FHAA under both the disparate treatment test or the disparate impact test.

### C. *The Spacing Requirement is Facially Invalid*

16. The 1,000 foot rule is unlawful under the Fair Housing Act, because it creates an explicit classification based on

handicap with no rational basis or legitimate government interest.

■ 17. The motives of drafters of a facially discriminating ordinance, whether benign or evil, is irrelevant to a determination of the lawfulness of the ordinance. The court must focus on the explicit terms of the ordinance. *See International Union, United Auto., etc. v. Johnson Controls, Inc.,* —— U.S. ——, ——, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158 (1991) ("the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination").

18. In the instant case the 1,000–foot rule contained in Ordinance No. 300 explicitly restricts the location of group homes for people with handicaps and caps the number of people with handicaps that can live in the Township.

■ 19. The language of the ordinance clearly refers to people with handicaps. It extends to "any facility" where "permanent care or professional supervision is present." Its reach coincides with the breadth of the definition of "handicap" under the Fair Housing Act. Under the Fair Housing Act's broad definition, a person is handicapped if he or she has a physical or mental impairment which substantially limits one or more major life activities, has a record of having such impairment, or is regarded as having such impairment. 42 U.S.C. § 3602(h). In using the words "permanent care" or "professional supervision," the individuals singled out for disparate treatment are those who are unable to live on their own, who, in the language of the Fair Housing Act, are "handicapped."

20. It is irrelevant that the spacing requirement may incidentally catch within its net some unrelated groups of people without handicaps, such as juveniles or ex-criminal offenders, that live in supervised housing arrangements. Testimony of Slade on cross. *See Hunter v. Underwood,* 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (struck down state constitutional provision aimed at disenfranchising blacks that was defended on the basis that it disenfranchised poor whites as well).

21. Recently, the Maryland legislature repealed a 1,000–foot distance requirement based on an opinion issued by the Maryland Attorney General advising the Maryland legislature that such a rule was illegal under the Fair Housing Act. 74 *Opinions of the Attorney General of Maryland* (Op. No. 89–026) (Aug. 7, 1989), Plaintiff's Trial Exhibit 80. The Maryland Attorney General found that Maryland's 1,000–foot distance requirement was not any less illegal as to people with handicaps just because it also had an impact on some group homes for people without handicaps.[4] *Id.* While these opinions of state attorney generals are not binding on me, I accept their analysis as sound.

22. In sum, the fact that the 1,000 foot spacing requirement may also incidentally catch in its net some group homes that serve individuals without handicaps does not vitiate the facial invalidity of the rule which clearly restricts the housing choices of people based on their handicaps and constitutes a cap or quota on the amounts of people that can live in the Township based on their handicap.

D. *The Township's Rationale*

■ 23. The Township's argument is flawed in its rationale that the spacing requirement was enacted to prevent the "clustering" of people was with disabilities, and to promote their "integration" into the community and was thus a benign, and

---

**4.** Other state attorney generals have likewise opined that their respective state distance rules are unlawful. Opinions of the Attorney General of Delaware (Op. No. 90–1001, Jan. 5, 1990) (5,000–foot distance rule held invalid) (Plaintiff's Trial Exhibit 81); Opinions of the Attorney General of Kansas (Op. No. 89–99, Aug. 11, 1989) (holds invalid a 1,000–foot rule) (Plaintiff's Trial Exhibit 82); Opinions of the Attorney General of North Carolina (July 6, 1989) (holds invalid a ½ mile distance rule) (Plaintiff's Trial Exhibit 83).

indeed salutary, requirement that was rationally related to a legitimate government purpose. Although benign, the reasonableness of the decision was not supported by the evidence and it is not an adequate justification to sustain the spacing requirement.

24. Although defendants presented witnesses to support that avoiding clustering and promoting integration was indeed its reasoning behind the ordinance, defendants presented no evidence at all to show the basis of that decision. Rather, the witnesses stated that clustering was a "bad idea" which was based upon unsupported notions or fears about people with handicaps. ·

25. Furthermore, integration is not an adequate justification under the FHAA. See United States v. Starrett City Associates, 840 F.2d 1096 (2d Cir.1988), cert. denied, 488 U.S. 946, 109 S.Ct. 376, 102 L.Ed.2d 365 (1988).

26. In Starrett City, the Court of Appeals for the Second Circuit struck down a racial quota which was designed to maintain racial integration in the complex and avoid the phenomenon of "tipping"[5]. The quota had resulted in minority applicants having to wait up to ten times longer than whites to obtain apartments. Starrett City, 840 F.2d at 1098–99.

27. The court rejected the argument that the Fair Housing Act was intended by Congress to promote racial integration in housing, it permits imposition of controls which deny housing on the basis of race or national origin if nondiscriminatory policies are likely to result in resegregation. Id. at 1100–01.

28. The court stated that, although tipping could be considered, "[I]t cannot serve to justify attempts to maintain integration at Starrett City through inflexible racial quotas that are neither temporary in na-

ture nor used to remedy past racial discrimination or imbalance within the complex." Id.; accord, United States v. Charlottesville Redevelopment & Housing Authority, 718 F.Supp. 461 (W.D.Va.1989); Burney v. Housing Authority of County of Beaver, 551 F.Supp. 746 (W.D.Pa.1982).

29. Under the analysis of Johnson Controls and Starrett City, the 1,000 foot requirement is plainly illegal. The 1,000 foot rule is effectively indistinguishable from a ceiling quota imposed on minorities for integration maintenance purposes. By its terms, the distance requirement disadvantages a class of people protected by the FHAA by indefinitely limiting access of that class to housing, by setting an upper limit or cap or quota on the number of persons with handicap who may live in the Township. The Township has not advance sufficient evidence in support of their reasoning behind the ordinance and has not advanced a legitimate purpose for the ordinance, as well meaning it may be thought. Ordinance No. 300 is therefore in violation of the FHAA.[6]

### E. Discriminatory Intent

30. As described above, Horizon House need not show that the Supervisors have had motives or unfounded fears for excluding group homes from the Township through the imposition of the 1,000–foot spacing rule. It is sufficient if plaintiff proves that the Township Supervisors mean and aim to restrict housing opportunities for people with handicaps. However, the history of the 1,000–foot rule and the flawed rationale offered for its justification, as described above, demonstrate that the Supervisors' reasons have been and still are irrational and unfounded, even though they honestly believe them to be otherwise.

**5.** Tipping occurs when the amount of minorities in an area exceeds a perceived balance and results in white people moving from the area, also known as "white flight."

**6.** Defendants presented the expert testimony of Sondra K. Slade, Esquire for the purpose of establishing, among other things, that passing the ordinance was a reasonable exercise of a

governmental function. I am not persuaded by her analysis. Even if the Townships proffered rationale was legitimate and reasonable, the standard under the FHAA is a higher level of scrutiny than rational basis test applied to an equal protection analysis. See, e.g., Schuylkill Township, No. 90–2165, 1990 WL 180980, at *6 n. 10, 1990 U.S.Dist. LEXIS, at *18 n. 10.

31. In the FHAA context, disparate treatment is the "intentional denial of housing based on an individual's race, color, religion, sex, national origin, or handicap." *Schuylkill Township*, No. 90–2165, 1990 WL 180980, at *7, 1990 U.S.Dist. LEXIS, at *20 (citing *International Board of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977)). In order to prove intentional discrimination it is not necessary to show an evil or hostile motive. It is a violation of the FHAA to discriminate even if the motive was benign or paternalistic. *Id.*, 1990 WL 180980, at *7 n. 12, 1990 U.S.Dist. LEXIS, at *20 n. 12.

32. The determination of whether an action is based on "discriminatory intent" requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 255–56, 97 S.Ct. 555, 558, 50 L.Ed.2d 450 (1977) (*Arlington Heights I*). This inquiry is required because it is unusual that a public official will openly reveal that he or she acted on the basis of discriminatory intent. *See Dailey v. Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) (if proof of a civil rights violation depends on an open statement by an official of an intent to discriminate, the [FHA] offers little solace to those seeking its protection). This case, however, presents circumstances where there is ample direct evidence of discriminatory animus.

33. The 1,000–foot spacing requirement in Ordinance No. 300 is a direct outgrowth of the 3,000–foot spacing requirement in the original Ordinance No. 261, enacted four years ago. Supervisor Held testified that he voted for the spacing requirement in the original ordinance out of concern that a group of persons with mental retardation might act unpredictably and erratically. Dep. of Held at 21–22.

34. No Township Supervisors at the time the original ordinance was passed could articulate a specific reason for a spacing requirement in the amount of 3,000–foot number. *See, e.g.,* Dep. of Shafter at 33; Dep. of Crandley at 30–31.

No Township Supervisor involved in the original ordinance could identify any report or expert consulted or other evidence regarding the viability of such a rule. *See* Dep. of Held at 14–15. Likewise, no Township Supervisor asked Pellegrino to explain the rule. *See* Dep. of Pellegrino at 48–51. Finally, Pellegrino could not identify a reason as to why he suggested to the Board a 2,000–foot spacing requirement between group homes as opposed to some other footage requirement. Dep. of Pellegrino at 50.

35. The failure to articulate a legitimate reason, or any reason, as to the 3000 foot spacing requirement is evidence that, when combined with the timing of the ordinance when plaintiff was opening its two homes, establishes that it was a response to community opposition and to outmoded fears about people with mental retardation.

36. The current Supervisors, like their predecessors, are also responding to community perceptions as a basis for the distance rule. For example, Supervisor Kautz testified that the reason for the distance rule was "primarily [because] of the perception of the people that live around them. The fact that they are sometimes perceived by people to be detrimental to property values." Plaintiff's Trial Exhibit 86 at 6, line 7–14. Supervisor Kautz testified at trial that the spacing requirement is necessary because "we felt that only one set of neighbors should be burdened with any one of them." Similarly, Township Supervisor Eileen Lemma testified that the distance requirement is for the benefit of the group home residents; if group homes were grouped near each other, she said, the personnel in the group homes would not tend to their needs. That the current spacing requirement is the result of irrational fears, although well intentioned, is also evidenced by lack of any evidence in support of the decision to have a spacing requirement beyond the "gut" instinct of the current Supervisors that clustering is bad and will hinder integration.

37. These views are unfounded and are not based on any credible opinion or evidence concerning group homes and people

with mental retardation. The evidence in this case shows that group homes have no adverse impact on the property values of a neighborhood; they do not impose a greater burden on public services (like public transportation) than other single family dwellings; they are not noisier or denser than a single family residence. Two or more group homes within 1,000 feet of each other do not create "clustering" or have any adverse impact on a community or neighborhood. *See* Testimony of Fenster. There is no evidence in the record to support the perception that group homes are a "burden" on the neighborhood or that harm will come to the residents of the group homes by living within 1,000 feet of each other.

38. Because Ordinance No. 300, on its face, excludes restricts and/or limits the number of people with handicaps from the Township, and their choices of where to live, and because there is evidence supporting the conclusion that that ordinance is the result of unfounded or stereotypical fears and because defendants have not advanced a supported rational basis or legitimate goal regarding their actions, the distance requirement in Ordinance No. 300 is in violation of the FHAA and the equal protection clause of the United States Constitution. *See Baxter v. City of Belleville*, 720 F.Supp. at 732 (intent to exclude people with HIV out of fear that they would spread a disease through the community violates the FHAA); *Burstyn v. Miami Beach*, 663 F.Supp. 528 (S.D.Fla.1987) (intent to exclude elderly people from certain streets because they would have a negative impact on the tourist trade violates the equal protection clause); *Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo*, 752 F.Supp. 1152, 1169 (D.P.R. 1990) (intend to exclude elderly people because of negative impact on neighborhood by seeing the elderly and ambulances violates the Fair Housing Act).

### F. *Discriminatory Effect*

39. Even if Ordinance No. 300 was not facially invalid and purposefully discriminatory, which I concluded it is, the 1000 foot distance requirement would ne-

vertheless violate the FHAA because it has a disparate impact or "effect" on the housing choices of people with handicaps.

40. The most often cited formulation of disparate impact analysis comes from the Seventh Circuit in *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) [hereinafter *Arlington Heights II*]. I accept the logic and analysis of that decision. There, in a case alleging racial discrimination, the Court of Appeals established a four pronged analysis for evaluating facially neutral conduct that produced a discriminatory effect but was taken with little or no discriminatory intent. The four prongs include: (1) the strength of plaintiff's showing of discriminatory effect; (2) whether there is some evidence of discriminatory intent; (3) defendant's professed interest in taking the action complained of; and (4) whether the plaintiff seeks to compel the defendant to affirmatively provide housing for members of a protected class or merely to restrain the defendant from interfering with individual property owners wishing to provide such housing. *Arlington Heights II*, 558 F.2d at 1290. Each prong has been satisfied in this case.

41. Plaintiffs have proved that there are discriminatory effects directly related to the 1,000–foot requirement. The spacing requirement limits the numbers of people with handicaps within the Township, limits their choices on where to live, limits their access to essential community resources, and thwarts the efforts to treat people with handicaps equally in the community negatively affecting their self-esteem. *See* Findings of Fact ¶¶ 60–69.

42. In addition to the effects on people with handicaps, the 1,000 foot rule has an effect on providers, like Horizon House, who provide services to people with disabilities. *Cf. Baxter v. Belleville*, 720 F.Supp. at 732; *Association of Relatives and Friends of AIDS Patients v. Regulations and Permits Administration*, 740 F.Supp. 95 at 106 (D.P.R.1990). Under the 1,000–foot spacing requirement, if a family care unit is already established in one unit of an

apartment building or complex, then the provider is deterred from exploring or developing the remainder of that complex even if homes and funding are available. Thus, while Horizon House and their clients may need, desire or simply want a particular site for programmatic, treatment, or other reasons, the 1000–foot rule limits them from acquiring it. No similar limit on choice affects biological families or people without a need for "permanent care or professional supervision."

43. The plaintiff have also proved some evidence of discriminatory intent, satisfying the second prong of *Arlington Heights II.* The distance requirement is the product of community fears about people with mental retardation.

44. Plaintiff's have proved that the defendants' interest in passing the ordinance is not strong, satisfying the third prong of *Arlington Heights II.* Under disparate impact analysis, a defendant has the burden of proving that its action furthers, "in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 148–49 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Huntington Branch, NAACP v. Huntington*, 844 F.2d 926, 936 (2d Cir.), *aff'd*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988).

45. The Township has not shown that the distance requirement advances any "legitimate, bona fide governmental interest." Although defendants advanced the rationale that they sought to avoid "clustering" of group homes for people with handicaps and that this interest springs, in part, out of concern for the residents of the group homes. Testimonies of Lemma, Kerins, and Slade. This rationale is wholly undermined by the existence of the Horizon House homes themselves. The group homes demonstrate that two homes, housing six people with mental retardation, which are within 800 feet of each other, are in two different neighborhoods, and not even close to clustering; as well, there is no evidence that clustering is detrimental to the health, safety and welfare of the community defendant's serve. Additional-

ly, it is an impermissible defense that thirty family care homes, or approximately 150 people with handicaps is "enough for Upper Southampton Township," (Testimony of William Kerins); especially with no evidence in support of that conclusion. The FHAA rejects any notion that a Township can somehow avoid the anti-discrimination mandate by accepting some sort of "fair share" or apportionment of people with disabilities.

46. Moreover, there is no evidence establishing that people with handicaps living close to one another is *per se* detrimental. Each situation requires an independent evaluation. Testimony of Thaler. As Ms. Thaler testified, "meaningful integration" is a deep and complex notion; it involves a variety of circumstances, not the least of which is the relationship between the individuals and their community. The first step, however, is to be "physically included" and to have choices about where to live.

47. The asserted rationale by the Township, when viewed against the historical backdrop of the 1000–foot rule, demonstrates that its motives are pretextual, or, at the least not supported by any evidence. *Cf. Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Arecibo*, 752 F.Supp. 1152 (D.P.R.1990) (neighbors' rationale that children might harm the elderly residents of a home has "no rational basis"); *United States v. Puerto Rico*, 764 F.Supp. 220 (D.P.R.1991) (concern for traffic had no rational basis where elderly disabled residents did not drive).

48. Even if the "avoidance of clustering" or "integration" were legitimate and bona governmental interest, and supported by the evidence in the case, there are less discriminatory ways to accomplish it. Ordinance No. 300 is overbroad for the asserted purpose. For example, Mr. Kerins acknowledged, that the 1,000 foot distance requirement precludes two family care homes from being on opposite sides of a turnpike or a lake, or in the case of Horizon House, in two very different neighborhoods even if they would thus not be clustered.

49. The 1,000–foot rule in its overbreadth is akin to the fire and safety codes struck down by the United States District Court for the Northern District of Ohio. In *Marbrunak v. City of Stow*, No. 5:90 CV 0925 (N.D.Ohio July 29, 1991) (Plaintiff's Trial Exhibit 67), the City of Stow defended its heightened safety and fire code regulations for small residences in which developmentally disabled persons lived by arguing that they are necessary to protect the residents. The court held that, while the stringent codes imposed by the City may increase safety, the City was prohibited by the Fair Housing Act from using "its concern for the safety and health of its disabled citizens as a pretext for actions that are actually based on outdated and unfounded prejudices and stereotypes about the abilities and limitations of handicapped persons."

50. In striking down the fire and safety requirements, the court reasoned that such "blanket" restrictions contravenes the FHAA mandate that group homes for people with handicaps be considered on a case-by-case basis. *Id.* at 24–25.

51. Like the safety and fire code rules in *Marbrunak*, the 1,000–foot requirement cuts with too broad a swath. It presumes that a community is saturated with homes if they are less than 1,000 feet apart. The distance rule is particularly offensive in high density areas.

52. The relief sought by the plaintiff weighs in its favor as to the final prong of disparate impact analysis. Horizon House asks that the Court declare Ordinance No. 300 unconstitutional and enjoin its enforcement. Horizon House is not asking that the Township affirmatively establish housing; only that the Township not restrict such housing.

53. In sum, because the 1,000–foot rule has a disparate impact on people with handicaps and because the Township has not shown a rational basis or legitimate interest to support the spacing requirement, the 1,000–foot requirement contained in Ordinance No. 300 violates the Fair Housing Act, 42 U.S.C. § 3604(f)(1) and (2).

### G. The Spacing Requirement Discriminates Against People with Disabilities by not Providing Them with a Reasonable Accommodation

54. The Township is also violating the reasonable accommodation provision of the Fair Housing Act through the enactment and enforcement of the 1,000–foot rule in Ordinance No. 300. 42 U.S.C. § 3604(f)(3)(B). Under this provision, it is a discriminatory housing practice to refuse to make "reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person *equal opportunity* to use and enjoy a dwelling." *Id.* (emphasis added).

55. One of the purposes behind the reasonable accommodation provision is to address individual needs and respond to individual circumstances. House Report at 18 (The Fair Housing Act "mandates that persons with handicaps be considered as individuals.")

56. Under this provision, affirmative steps are required to change rules or practices if they are necessary to allow a person with a disability an opportunity to live in the community: "The concept of 'reasonable accommodation' has a long history in regulations and case law dealing with discrimination on the basis of handicap. A discriminatory rule, policy, practice or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted. This section would require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling." House Report, at 25; *see also Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1384–85 (3d Cir. 1991).

57. Courts interpreting the reasonable accommodation provision of the Fair Housing Act have ruled that municipalities such as Upper Southampton Township must change, waive, or make exceptions in their zoning rules to afford people with disabilities the same opportunity to housing as

those who are without disabilities. *United States v. Village of Marshall*, 787 F.Supp. 872, 876–78 (W.D.Wis.1991); *United States v. Puerto Rico*, 764 F.Supp. 220, 224 (D.P.R.1991); *Oxford House–Evergreen v. Plainfield*, 769 F.Supp. 1329, 1344–45 (D.N.J.1991).

58. The distance rule in Ordinance No. 300 is a blanket and categorical rule. The Township's position that a provider obtain a variance to open up a group home within 1,000 feet of another is no accommodation at all. As demonstrated by the facts of this case, a variance is a lengthy, costly and burdensome procedure.

#### H. *The Spacing Requirement Violates the Equal Protection Clause*

59. Once a classification scheme is shown which treats people with disabilities differently than people without disabilities, the Township must show that the scheme is rationally related to a legitimate governmental interest. *See Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3253, 87 L.Ed.2d 313 (1985).

60. I have found as a fact and concluded above that Upper Southampton Township has no rational basis for imposing a distance rule on people with disabilities while allowing biological families and five or fewer unrelated people without disabilities to live wherever they wish. There has been no showing that the Horizon House homes or any other home for disabled citizens has had an adverse impact on Upper Southampton Township. Furthermore, there has been no showing that the 1000–foot distance requirement, which is the equivalent of three-and-one-third football fields, between homes or apartments of people with disabilities is rationally related to any legitimate government purpose. To the contrary, the evidence has shown that this is only related to the Township's ungrounded fears about people with handicaps. Ordinance No. 300 simply makes it more difficult for citizens with disabilities to live near one another in the pursuit of happiness to which we are all entitled.

### III. CONCLUSION

Based on the foregoing findings of facts and conclusions of law, 1000–foot spacing requirement in Ordinance No. 300 violates the FHAA and the equal protection clause of the United States Constitution and plaintiff will be granted injunctive relief declaring it invalid and enjoining its enforcement.