**ASSOCIATION FOR ADVANCEMENT OF THE MENTALLY HANDICAPPED, INC., a New Jersey Not-for-Profit Corporation, Creative Property Management of N.J., Inc., a New Jersey Corporation, and Annie Sims and James Williams, Plaintiffs,**

v.

**CITY OF ELIZABETH, a municipal corporation of the State of New Jersey, City Council of the City of Elizabeth, and William Rapp, in his capacity as Director of Construction for the City of Elizabeth, Defendants.**

Nos. Civ. No. 92–537 (HAA),
Civ. No. 92–846 (HAA).

United States District Court,
D. New Jersey.

Oct. 25, 1994.

Robert C. Griffen, Glerum, Griffen and Grinrod, Totowa, NJ, for plaintiffs, AAMH and CPM, Inc.

Stephen Eisdorfer, Hill Wallack, Princeton, NJ, for plaintiffs, Annie Sims and James Williams.

Raymond T. Bolanowski, Elizabeth, NJ, for defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This matter comes before the court today upon a motion by plaintiffs for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons detailed below, plaintiffs' motion is **GRANTED.**

### I. Introduction

This case involves the following question: Does a municipal ordinance, and the state statute upon which the ordinance is based, that sets up three barriers to the provisioning of community residences for people with developmental disabilities violate the Fair Housing Amendments Act of 1988. Let me begin by setting forth the relevant parties.

Plaintiff *Association for Advancement of the Mentally Handicapped, Inc.* ("AAMH") is a nonprofit corporation that provides social support services, including assistance obtaining housing, employment, education, financial management and medical assistance, to its developmentally disabled members. AAMH also manages and holds an ownership interest in plaintiff Creative Property Management of N.J., Inc.

Plaintiff *Creative Property Management of N.J., Inc.* ("CPM") is a nonprofit corporation which purchases and holds real estate for use and occupancy by developmentally disabled persons.

Plaintiffs *Annie Sims* and *James Williams* are members of AAMH living semi-independently in Elizabeth with support and services provided by AAMH. Both are developmentally disabled.

The defendants in the case are the *City of Elizabeth,* the *City Council of the City of Elizabeth,* and *William Rapp,* who is the director of construction for the city of Elizabeth.

### II. Factual and Procedural Background

The following constitutes the undisputed facts of record in this case:

In December of 1990, SERV Centers of New Jersey, Inc., ("SERV") entered into a contract with the New Jersey Department of Human Services ("DHS") pursuant to which SERV would provide a transitional community residence for emotionally disturbed children discharged from Elizabeth General Hospital. SERV then located a suitable house under construction on Livingston Road in Elizabeth. The Elizabeth Construction and Zoning Department informed SERV that a community residence for the developmentally disabled was a permitted use at this location. Consequently, SERV contracted to buy the house.

In September of 1991, members of the community in which the SERV house was located learned of SERV's intended use for the house. On September 15, they voiced their concerns about the house at a meeting with Elizabeth City Councilman Robert Jaspen. In particular, people were concerned that their children might not be safe if the SERV residence housed emotionally disturbed children.

Upon being informed of the situation by Councilman Jaspen, then Elizabeth Mayor Thomas Dunn called a meeting with his department heads to discuss the situation. At the meeting Mayor Dunn "strongly suggested" to Elizabeth Director of Construction, William Rapp that he take every legal step to stop the renovation of the SERV house until an investigation of the situation could be completed. Director Rapp stated that he

had sufficient legal reasons to issue a stop work order and it was thereafter issued. Mayor Dunn later stated, referring to this meeting,

> there was a general attitude initiated by myself, ..., that, 'Well, we better damn well stop what's going on up there in view of the fact that [SERV] didn't communicate with the city through proper channels.'

Deposition of Thomas Dunn, Joint Appendix of Plaintiffs at 52a–53a [hereinafter "Dunn Dep."].

Mayor Dunn also contacted Mr. Steven Ramsland, the President of SERV. Mr. Ramsland informed the Mayor that the SERV house would be occupied by eight severely emotionally disturbed teenagers. Mayor Dunn later stated that he told Mr. Ramsland of his "disgust and of [his] determination to use every legal and proper maneuver available to [the mayor] to stop SERV's invasion of Elizabeth." Dunn Dep. at 30a–31a. When later explaining this comment, the Mayor stated that he thought it to be "illegal", "when a highly residential neighborhood was to be changed in character without any communication to the Mayor and Chief Executive of the City, nor to the City Council." *Id.*

On September 18, 1991, Mayor Dunn sent a telegram to the State Commissioner of DHS requesting that funding for the SERV house be withdrawn. On September 19, 1991, Mayor Dunn spoke to a group of—by the Mayor's estimation—600 to 700 residents of Elizabeth who were concerned about the SERV situation. Referring to SERV, the Mayor told the crowd,

> The law may seem, to the enemy, to be on its side. If so, the law must be changed. Regardless of words in the law, right is on our side.

Dunn Dep. at 39a. The Mayor later explained what he meant by this statement. The Mayor stated that Mr. Ramsland, the president of SERV, told him that neither the mayor nor the city council need be consulted prior to the establishment of a residence like the SERV house. The Mayor concluded that if Mr. Ramsland's statement of the law was correct, then the law was wrong and should be changed.

On October 7, 1991, at a special meeting, the Elizabeth Planning Board adopted a resolution recommending that the Elizabeth City Council amend the city's zoning code. The city zoning code was subsequently amended by Ordinance No. 2426 which required conditional use permits for community residences housing more than six developmentally disabled persons. Ordinance No. 2426 further provided, among other things, that a conditional use permit would be automatically denied in two situations:

> 1) if the proposed residence is located within 1,500 feet of an existing residence for developmentally disabled; or
>
> 2) if existing community residences or community shelters within the township exceed 50 persons or 0.5% of the township population, whichever is greater.

The ordinance drew its authority from the New Jersey Municipal Land Use Law ("MLUL"). N.J.S.A. 40:55D–66.1 *et seq.* The MLUL generally permits community residences for the developmentally disabled, however, in the case of community residences housing more than six persons, it authorizes municipalities to enact zoning ordinances that require conditional use permits. Requirements for the issuance of these conditional use permits must be "reasonably related to the health, safety and welfare of the residents of the district." N.J.S.A. 40:55D–66.1. The statute also provides that a conditional use permit may be denied if (a) the residence will be located within 1,500 feet of an existing residence or community shelter for victims of domestic violence, or (b) the number of persons, other than resident staff, residing at existing such residences or shelters within the municipality exceeds the greater of 50 persons or 0.5% of the municipal population. *Id.*

On December 23, 1991, the Elizabeth City Council passed Ordinance No. 2434 which added a third situation in which a conditional use permit would be automatically denied: if the proposed community residence is within 1,500 feet of a school or day care center.

At this point the plaintiffs in this case entered the picture. In December of 1991,

CPM purchased a condominium unit in a complex in Elizabeth known as Joelle Manor.[1] AAMH offered the unit to plaintiffs Annie Sims and James Williams. CPM subsequently applied to the city for a certificate of occupancy. In a letter to AAMH's attorney in response to the application, defendant William Rapp stated that the proposed use of the condominium—housing developmentally disabled persons—would violate "the requirement of not being 'located within 1500 feet of a community residence' ... since the AAMH has indicated ... that it has 'ownership interest as to seven of twelve units contained in the building.'" Letter of William Rapp, January 17, 1992, Joint Appendix of Plaintiffs at 165a–166a. On January 22, 1992, Rapp denied the certificate of occupancy.

On February 13, 1992, AAMH and CPM filed this action against defendants alleging housing discrimination against developmentally disabled persons based on various federal and state grounds. On February 24, 1993, Annie Sims and James Williams filed a separate civil action against the same defendants and also alleged that defendants' actions violated both federal and state law. These cases were consolidated in April of 1992.

After the commencement of this suit, on June 23, 1993, the City of Elizabeth enacted Ordinance No. 2607 which revised the requirements for the granting of conditional use permits for community residents with more than six residents. However, the ordinance retains the three restrictions which are the subject of this motion. The ordinance continues to provide for the automatic denial of a conditional use permit if

(1) the proposed location of a community residence for more than six residents is within 1,500 feet of an existing residence or shelter for victims of domestic violence;

(2) the total number of persons residing in community residences or shelters in the City exceed fifty persons or five-tenths of one percent of the population of the City of Elizabeth, whichever is greater; or

(3) the proposed location of a community residence for more than six residents is within 1,500 feet of a school or day care center.

City of Elizabeth, N.J., Ordinance No. 2607 (June 23, 1993).

In this motion for partial summary judgment plaintiffs ask the court to declare these three provisions the City ordinance and the portion of the MLUL upon which the ordinance is based to be violative of the Federal Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq.[2] Plaintiffs also seek an order permanently enjoining the defendants from enforcing the portions of the City ordinance which the court invalidates.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). See also Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir.1989); Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.), cert. dism'd, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Indiana Hospi-

---

**1.** At the time of the purchase, CPM owned seven other units in the complex. On average, five of the units were used to house ten developmentally disabled persons. The other two units housed AAMH staff and served as a location from which counseling, supervision and support were provided.

**2.** In this motion, plaintiffs also request that the court declare the Elizabeth Ordinance invalid based on the New Jersey Law Against discrimination (N.J.S.A. 10:5–1 et seq.) and the Due Pro-

cess and Equal Protection Clauses of the United States and the New Jersey Constitutions. However, because I am declaring the ordinance and the relevant portion of the New Jersey Statute invalid under the FHAA, I will not address these claims. See Jean v. Nelson, 472 U.S. 846, 854, 105 S.Ct. 2992, 2996–97, 86 L.Ed.2d 664 (1985) ("[a court] ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable") (citations omitted).

*tal,* 843 F.2d 139, 143 (3d Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988).

■ The substantive law will identify which facts are "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

■ The party seeking summary judgment always bears the initial burden of production, i.e., of making a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the non-moving party has not shown facts relating to an essential element of the issue for which it bears the burden. *Id.* at 322–23, 106 S.Ct. at 2552. Once either showing is made, the burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. *Id.* at 324, 106 S.Ct. at 2553.

■ However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations—these tasks are left to the fact-finder. *Petruzzi's IGA v. Darling–Delaware,* 998 F.2d 1224, 1330 (3d Cir.1993). Therefore, to raise a genuine issue of material fact, " 'the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id. See also, Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

If the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law, then summary judgment may be granted.

### III. Discussion

#### A. The Fair Housing Amendments Act of 1988.

The Fair Housing Amendments Act of 1988 (the "FHAA"), 42 U.S.C. § 3601 *et seq.,* extended the protection of the federal fair housing law to persons with disabilities. The FHAA prohibits discrimination on the basis of a physical or mental handicap. 42 U.S.C. § 3604(f)(1).

Section 3604(f)(1) makes it unlawful

[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it is sold, rented, or made available; or

(C) any person associated with that buyer or renter.

In addition, under the FHAA it is unlawful to discriminate against any person in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a handicap of that person." 42 U.S.C. § 3604(f)(2).

The FHAA states that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. § 3615.

The FHAA's legislative history indicates that Section 3604(f) was intended to reach a wide array of discriminatory housing practices, including licensing laws which purport to advance the health and safety of the community. The legislative history states:

[§ 3604(f) ] would also apply to state or local land use and health and safety laws, regulations, practices and decisions which discriminate against individuals with hand-

icaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.

The Committee intends that the prohibitions against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice.

*United States v. Schuylkill Township, Pa.,* 1990 WL 180980 *4–5 (E.D.Pa. November 16, 1990) (quoting H.R.Rep. No. 100–711, 100th Cong., 2d See. 24, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 2173, 2185).

Despite the broad reach of the FHAA, however, not all zoning ordinances which impact on the handicapped are *per se* invalid. "Rather Congress has indicated the FHAA is intended to allow reasonable government limitations so long as they are imposed on all groups and do not effectively discriminate on the basis of a handicap." *Id.*

■ A violation of the FHAA can be established by demonstrating that the challenged statute or ordinance discriminates against the handicapped on its face and serves no legitimate government interest.[3] *Horizon House v. Township of Upper South-*

*hampton,* 804 F.Supp. 683, 693 (E.D.Pa. 1992), *aff'd mem.,* 995 F.2d 217 (3d Cir.1993); *Potomac Group Home v. Montgomery County, Md.,* 823 F.Supp. 1285, 1295 (D.Md.1993). In addition, whether the motives of the drafters of a facially discriminating ordinance are benign or evil is irrelevant to a determination of the lawfulness of the ordinance. The court must focus on the explicit terms of the ordinance. *Horizon House,* 804 F.Supp. at 694 (citing *International Union, United Auto, etc. v. Johnson Controls, Inc.,* 499 U.S. 187, 199, 111 S.Ct. 1196, 1203–04, 113 L.Ed.2d 158 (1991) in which the Supreme Court stated in a Title VII case that "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination.").

■ If the statute or ordinance is discriminatory on its face, then the burden is on the defendant to justify the discriminatory classification. *See Resident Advisory Board v. Rizzo,* 564 F.2d 126, 149 (3d Cir.1977) (hereinafter *"Rizzo"*); *Horizon House,* 804 F.Supp. at 693; *Potomac Group Home,* 823 F.Supp. at 1295. "[A] justification must serve, in theory and in practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Rizzo,* 564 F.2d at 149.

Before analyzing the validity of the Elizabeth Ordinance and the authorizing New Jersey Statute under the FHAA, it should be noted that the ordinance and the statute clearly apply to the same persons Congress sought to protect by enacting the FHAA.

---

3. A *prima facie* case under the FHAA will also be established if the plaintiff can show either "discriminatory treatment or discriminatory effect alone, without proof of discriminatory intent." *Doe v. City of Butler, Pa.,* 892 F.2d 315, 323 (3d Cir.1989) (citations omitted); *Horizon House v. Township of Upper Southhampton,* 804 F.Supp. 683, 693 (E.D.Pa.1992), *aff'd mem.,* 995 F.2d 217

(3d Cir.1993); *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 460 (D.N.J.1992); *United States v. Borough of Audobon, N.J.,* 797 F.Supp. 353, 359 (D.N.J.1991), *aff'd mem.,* 968 F.2d 14 (3d Cir.1993). However, these two alternative theories need not be addressed because both the ordinance and the state statute clearly discriminate on their face.

Under the FHAA, a person is considered handicapped if he or she has a physical or mental impairment which substantially limits one or more major life activities, has a record of having such an impairment, or is regarded as having such an impairment. 42 U.S.C. § 3602(h). *See also, Horizon House,* 804 F.Supp. at 694 (stating that FHAA had broad definition of handicap); *Borough of Audobon, N.J.,* 797 F.Supp. at 358 (holding that persons suffering or recovering from alcoholism and/or drug addiction are "handicapped" within the meaning of the FHAA).

The Elizabeth Ordinance derives its definition of developmentally disabled from the authorizing New Jersey statutes. The authorizing statute defines developmentally disabled as those persons who meet five criteria—one of which is a substantial limitation in three or more major life activities.[4] The FHAA's definition of handicapped encompasses the Elizabeth ordinance's and the New Jersey Statute's definition of developmentally disabled. Therefore, the FHAA applies to the ordinance and the statute.

### B. The Elizabeth Ordinance.

"An ordinance that uses discriminatory classifications is unlawful in all but rare circumstances." *Horizon House,* 804 F.Supp. at 693.

The City of Elizabeth ordinance uses a discriminatory classification on its face. The ordinance states, in part,

> Community residences for the developmentally disabled … shall be a permitted use in all residential zones of a municipality, and the requirements therefor shall be the same as for single family dwelling units located within such zones, provided, however, community residence [sic] for the developmentally disabled …, as authorized by N.J.S.A. 40:55D–66.1 and 40:55D–66.2, housing more than six (6) persons excluding resident staff, shall be permitted as a conditional use in all residential zones provided the following conditions are met or maintained: [the conditions that follow are the three delineated, *supra,* at pp. 618–619 which are at issue in this case].

City of Elizabeth, N.J., Ordinance No. 2607 (June 23, 1993).[5]

The ordinance discriminates on its face by imposing conditions on the establishment of community residences for the developmentally disabled housing more than six persons that are not imposed on residences housing more than six persons who are not developmentally disabled.[6] This clearly restricts the

---

4. Under these statutes, "developmentally disabled" means a severe, chronic disability of a person which:

 a. is attributable to a mental or physical impairment or combination of mental or physical impairments;

 b. is manifest before age 22;

 c. is likely to continue indefinitely;

 d. results in substantial functional limitations in three or more of the following areas of major life activity, that is, self-care, receptive and expressive language, learning, mobility, self-direction and capacity for independent living or economic self-sufficiency; and

 e. reflects the need for a combination and sequence of special interdisciplinary or generic care, treatment or other services which are of lifelong or extended duration and are individually planned and coordinated.

N.J.S.A. 30:11B–2. Developmental disabilities include, but are not limited to, severe disabilities attributable to mental retardation, autism, cerebral palsy, epilepsy, spina bifida and other neurological impairments where the above criteria are met. *Id.*

5. N.J.S.A. 40:55D–66.1 authorizes municipalities in New Jersey to enact zoning ordinances that require conditional use permits for community residences for the developmentally disabled housing more than six such persons. The validity of this statute under the FHAA is also at issue in this case and is discussed *infra.*

 N.J.S.A. 40:55D–66.2 defines "community residence for the developmentally disabled" as any licensed community residential facility "providing food, shelter, and personal guidance, under such supervision as required, to not more than 15 developmentally disabled or mentally ill persons, who request assistance, temporarily or permanently, in order to live in the community, and shall include, but not be limited to: group homes, half-way houses, intermediate care facilities, supervised apartment living arrangements, and hostels."

6. That the ordinance also applies to community shelters for victims of domestic violence does not detract from its facial invalidity. *See Horizon House,* 804 F.Supp. at 694 ("the fact that the 1,000 foot spacing requirement may also incidentally catch in its net some group homes that serve individuals without handicaps does not vitiate the facial invalidity of the rule which clearly restricts the housing choices of people based on

housing choices of people based on their handicaps. As the legislative history of the FHAA states

> [w]hile state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. *Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.*

*Schuylkill Township, Pa.,* 1990 WL 180980 *4–5 (E.D.Pa. November 16, 1990) (quoting H.R.Rep. No. 100–711, 100th Cong., 2d See. 24, *reprinted in* 1988 U.S.Code Cong. & Admin.News at 2173, 2185) (emphasis added). Therefore, the ordinance is facially discriminatory and will only be upheld if it serves a legitimate government purpose.

The defendants appear to put forward two rationales for the ordinance.

First, the defendants argued at oral argument and in their brief in opposition to this motion that because developmentally disabled persons may pose a risk of danger to the community, the City has a right to be notified and to have input into the types of residences the city will "host." *See, e.g.,* Defendants' Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 4. ("[B]oth the State Statute and the Ordinances enacted pursuant to its authority represent valid exercises of the police power, designed as they are to prevent any threat of danger to the community.... [therefore], as a matter of basic fairness, the host community is entitled to know about the kinds of residents whom they will host.").

Second, an examination of the record before the court indicates that another rationale for the ordinance may have been that

because, in the defendants' view, community residences of this sort change the character of a residential neighborhood, communication with the mayor and the city council should be required before a community residence is established. *See, e.g.,* Dunn Dep. at 31a (Mayor Dunn stated in a deposition that he thought it to be "illegal" "when a highly residential neighborhood was to be changed in character without any communication to the Mayor and Chief Executive of the City, nor to the City Council.").

■ I will first address defendants' argument concerning the threat of harm created by the presence of developmentally disabled persons in the community.

■ This argument fails because there is no evidence in the record that indicates that developmentally disabled persons, as defined by the New Jersey statutes, would pose any danger to the community. The defendants have not exceeded the "mere scintilla" standard; there is no evidence in the record upon which a factfinder could reasonably conclude that developmentally disabled persons would pose a risk of danger to other members of the community. *See Petruzzi's IGA,* 998 F.2d at 1330. Courts have held that unsubstantiated, generalized fears are not a valid basis for discriminating against the handicapped. *See, e.g., City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 448, 105 S.Ct. 3249, 3258–59, 87 L.Ed.2d 313 (1985) (unsubstantiated fears of residents rejected as a basis for differential treatment of home for mentally retarded persons in an Equal Protection case); *Horizon House,* 804 F.Supp. at 695–97 ("no evidence in the record to support the perception that group homes are a 'burden' on the neighborhood"; invalidating ordinance requiring 1000 foot spacing requirement between group homes).

Not only is there no evidence in the record to support defendants' claim that developmentally disabled persons may pose a risk of harm, there is evidence in the record that the New Jersey Department of Human Services

---

their handicaps...."); *Potomac Group Home,* 823 F.Supp. at 1296 n. 9 ("Defendants contend that the regulation is not discriminatory because it also applies to group homes for disadvantaged youths. There is no merit to this argument. The parties agree that the vast majority of group homes to which the regulation applies provide housing for the disabled.").

("DHS") takes affirmative steps to ensure that no person who could be considered dangerous is placed in a community residence. Claire Mahon, the Assistant Director for Community Services of the Division of Developmental Disabilities in the DHS, explained in her certification that DHS staff "review each person with a developmental disability being considered for placement in a community residence, ..., to ensure that no person who could be considered a danger to the community is released from the hospital or placed in a community residence." *See* Certification of Claire Mahon at ¶ 6, Supplemental Joint Appendix of Plaintiffs.

In addition, even if there were a evidentiary basis in the record to support defendants' claim that some developmentally disabled persons may pose a risk of harm to the community, defendants would still have failed to meet their burden in justifying the ordinance. This is because, while protecting members of the community from harm is clearly a legitimate government purpose, the conditions in the ordinance do not serve that interest, "in theory and in practice." *See Rizzo*, 564 F.2d at 149.

 There is no evidence in the record which indicates that automatically denying conditional use permits to community residences housing six or more developmentally disabled persons which are sought to be established within 1,500 feet of an existing residence or within 1,500 feet of a school or day care center furthers the City's interest in protecting its citizens from potential danger. Likewise, there is no evidence in the record which indicates that automatically denying a conditional use permit when the total number of persons residing in such residences or shelters in the City exceeds fifty persons or five-tenths of one percent of the population of the City of Elizabeth, whichever is greater, furthers the City's interest in protecting its citizens from potential danger.

These conditions do not seem to be related in any way to the City's professed objective of ensuring that potentially dangerous persons are not housed in community residences for the developmentally disabled. Defendants argue that because developmentally disabled persons may be dangerous, the City

should be notified and have input before a community residence is established. However, the ordinance is not one which provides for some type of screening process by the City—which may or may not be valid under the FHAA. The ordinance merely provides for the automatic denial of a conditional use permit if one of the three conditions are met. This in no way serves the interest put forward by defendants to justify the ordinance.

Therefore, the defendants did not meet their burden of justifying the ordinance based on this rationale.

 Defendants' second rationale is that the ordinance protects the residential character of neighborhoods surrounding community residences. The City has a legitimate interest in protecting the residential character of the surrounding neighborhood. *See Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 462 (D.N.J.1992).

However, this rationale suffers from a defect similar to that suffered by their first rationale. Namely, the record is devoid of any evidence upon which a factfinder could reasonably conclude that community residences housing more than six developmentally disabled persons would detract from a neighborhood's residential character. Defendants have not exceeded the "mere scintilla" standard. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

There is no evidence in the record which suggests that the presence of the developmentally disabled persons that currently live in Elizabeth in the CPM-owned condominium complex detracts from the residential character of the neighborhood. Furthermore, even if there were evidence in the record which indicated that community residences detracted from the residential character of the neighborhood, the defendants have not put forward any evidence that the three requirements for automatic denial in the ordinance "serve, in theory and in practice," that interest, and that there is "no alternative course of action could be adopted that would enable

that interest to be served with less discriminatory impact." *See Rizzo*, 564 F.2d at 149.

Therefore, the defendants also have not met their burden of justifying the ordinance based on this rationale.

In summary, the defendants have not exceeded the "mere scintilla" standard. There is no evidence in the record upon which a factfinder could reasonably conclude that the three, alternative requirements for automatic denial of a conditional use permit in the Elizabeth Ordinance "serve, in theory and in practice, a legitimate, bona fide interest" of the City of Elizabeth. Therefore, the three conditions in the Elizabeth Ordinance at issue in this case violate the FHAA and plaintiffs' motion for partial summary judgment on this ground is granted.

■■■ In this motion plaintiffs also seek an order permanently enjoining the defendants from automatically denying conditional use permits to community residences for the developmentally disabled based on the three conditions at issue. Section 3613 of the FHAA states

if the court finds that a discriminatory housing practice has occurred ..., the court may ... grant as relief, as the court deems appropriate, any permanent or temporary injunction.

42 U.S.C. § 3613(c)(1). In this case, permanent injunctive relief is appropriate, and I will issue an order permanently enjoining defendants from enforcing the portions of Ordinance No. 2607 that impose these spatial and numerical limitations on housing for the developmentally disabled.

### C. The New Jersey Statute.

■■■ Plaintiffs also contend that the portion of the New Jersey Municipal Land Use Law ("MLUL"), upon which the City of Elizabeth draws the authority for its ordinance, is also invalid under the FHAA.

The relevant portion of the MLUL also uses a discriminatory classification on its face. The statute provides that municipal zoning ordinances may require conditional use permits for community residences for the developmentally disabled housing more than

six persons. *See* N.J.S.A. 40:55D–66.1. The statute further provides,

Any requirements imposed for the issuance of a conditional use permit shall be reasonably related to the health, safety and welfare of the residents of the district; provided, however, that a municipality may deny such a permit to any proposed community residence for the developmentally disabled ... which would be located within 1500 feet of an existing such residence or shelter; provided further, however, that a municipality may deny the issuance of any additional such permits if the number of persons, other than resident staff, resident at existing such community residences or community shelters within the municipality exceeds 50 persons, or 0.5% of the population of the municipality, whichever is greater.

N.J.S.A. 40:55D–66.1.

The statute authorizes municipalities to impose conditions on the establishment of community residences for the developmentally disabled housing more than six persons that are not imposed on residences housing more than six persons who are not developmentally disabled, and therefore is discriminatory on its face. *See Schuylkill Township, Pa.*, 1990 WL 180980 *4–5 (quoting FHAA legislative history which states "[s]ince these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.").

Because that portion of the MLUL is discriminatory on its face, it is only valid under the FHAA if defendants demonstrate a justification that serves, "in theory and in practice, a legitimate, bona fide interest", and that there "no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Rizzo*, 564 F.2d at 149.

Referring to the provision of the MLUL which authorizes the denial of conditional use permits to any community located within 1,500 feet of another one and the denial of additional conditional use permits if the population of existing community residences exceeds 50 persons, or 0.5% of the municipal

population, whichever is greater, the legislative history of the MLUL states: "This provision would provide a safeguard against changing the residential character of a given municipality, through the placement in the municipality of too many such residences." New Jersey Senate County and Municipal Government Committee Statement to Senate No. 210, dated May 18, 1978, at 3.

As with the City of Elizabeth Ordinance, the record is devoid of any evidence upon which a factfinder could reasonably conclude that these two conditions "serve, in theory and in practice," the State's interest in preserving the residential character of a municipality, and that there is "no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *See Rizzo,* 564 F.2d at 149. Therefore, this provision of the MLUL is invalid under the FHAA to the extent that it permits municipalities to enact zoning ordinances containing these conditions without justifying the conditions as serving a legitimate interest of the municipality, and ensuring that no less discriminatory, alternative course of action could be adopted that would serve that interest. In other words, MLUL is invalid under the FHAA, to the extent that it permits municipalities to adopt zoning ordinances which would violate the FHAA. Therefore, plaintiffs' motion for partial summary judgment on this ground is also granted.

### CONCLUSION

For the reasons detailed above, plaintiffs' motion for partial summary judgment is **GRANTED.**