

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-1998

# NJ Coalition Rooming v. Mayor & Cncl Asbury

Precedential or Non-Precedential:

Docket 97-5483

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"NJ Coalition Rooming v. Mayor & Cncl Asbury" (1998). *1998 Decisions*. Paper 179.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/179

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 30, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-5483

NEW JERSEY COALITION OF ROOMING AND BOARDING
HOUSE OWNERS; LOUIS COOK; JOHN E. BROWN;
LEONARD LEVY; CAROL WISE; BRENDA COPELAND;
MICHAEL BYRNE; BEVERLY DEMING; EUGENE HODAS
        Appellants

v.

MAYOR AND COUNCIL OF THE CITY OF ASBURY PARK;
THE CITY OF ASBURY PARK, A MUNICIPAL
CORPORATION OF THE STATE OF NEW JERSEY; MAYOR
AND COUNCIL OF THE TOWNSHIP OF NEPTUNE; THE
TOWNSHIP OF NEPTUNE, A MUNICIPAL CORPORATION
OF THE STATE OF NEW JERSEY; MAYOR AND COUNCIL
OF KEANSBURG; BOROUGH OF KEANSBURG, A
MUNICIPAL CORPORATION OF THE STATE OF
NEW JERSEY

MAYOR AND COUNCIL OF THE CITY OF ASBURY PARK;
THE CITY OF ASBURY PARK
        Defendants/Third-Party Plaintiffs

v.

STATE OF NEW JERSEY
        Third-Party Defendant

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 94-cv-05134)

Argued: May 4, 1998

Before: BECKER, Chief Circuit Judge,
SCIRICA and COWEN, Circuit Judges.

(Filed July 30, 1998)

ROBERT C. GRIFFIN, ESQUIRE
  (ARGUED)
Griffin & Griffin
415 Route 10
Suite 7
Randolph, NJ 07869

Attorney for Appellants,
New Jersey Coalition of Rooming and
Boarding House Owners; Louis Cook;
John E. Brown; Leonard Levy;
Carol Wise; Brenda Copeland;
Michael Byrne; Beverly Deming;
Eugene Hodas

GLENN C. MOTYCZKA, ESQUIRE
  (ARGUED)
JAMES J. HIGGINS, ESQUIRE
Boyar, Higgins & Suozzo, P.A.
10 Park Place, Suite 415
Morristown, NJ 07960

DONALD L. BEEKMAN, ESQUIRE
47 Main Avenue
P.O. Box 395
Ocean Grove, NJ 07756

Attorneys for Appellees,
Mayor and Council of the Township
of Neptune, and Township of
Neptune

2

PETER VERNIERO, ESQUIRE
Attorney General of New Jersey
JOSEPH L. YANNOTTI, ESQUIRE
Assistant Attorney General
CHERYL R. CLARKE, ESQUIRE
  (ARGUED)
Deputy Attorney General
Office of Attorney General General of
 New Jersey
Richard J. Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625

Attorneys for Appellee,
State of New Jersey

OPINION OF THE COURT

BECKER, Chief Circuit Judge.

The New Jersey Coalition of Rooming and Boarding House Owners (the "Coalition"), which represents owners of rooming and boarding houses ("R&B houses") in the Neptune, New Jersey area, together with a number of individuals who are residents of those R&B houses, sued in the district court to have the Rooming and Boarding House Municipal Licensing Law, N.J. Stat. Ann. S 40:52-9 et seq. (the "Licensing Law" or the "Act"), and Neptune Ordinances Nos. 1658 and 1661 (the "Ordinances"), declared invalid under the United States and New Jersey constitutions, the New Jersey Law Against Discrimination, N.J. Stat. Ann. S 10:5-1 et seq. ("NJLAD"), and the Fair Housing Amendments Act of 1988, 42 U.S.C. S 3601 et seq. ("FHAA"). Defendants are the Township of Neptune and the State of New Jersey.1

The FHAA declares that it is unlawful "to discriminate against any person in the terms, conditions, or privileges of

_____

1. Originally, the City of Asbury Park and the Borough of Keansburg were also named as defendants. Before trial, these defendants settled with plaintiffs.

3

sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of -- (A) that person; . . . or (C) any person associated with that person." 42 U.S.C. S 3604(f)(2).2 The FHAA further provides that discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. S 3604(f)(3)(B). It also stipulates that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. S 3615.

Plaintiffs challenged a number of provisions in the Act and Ordinances. The district court granted relief on several of the plaintiffs' claims and invalidated portions of the Act and Ordinances, specifically provisions that imposed onerous inspection, licensing, bonding, and zoning requirements. Defendants have not appealed from those aspects of the district court's order. The court denied relief on the plaintiffs' other claims because it determined that they lacked standing in view of certain grandfathering provisions in the Act. Plaintiffs seek here to overturn the

_____

2. Plaintiffs assert, and the district court apparently found, that a significant percentage of the residents of the R&B houses and a number of the individual plaintiffs are handicapped individuals, many of whom have been deinstitutionalized from state mental hospitals. New Jersey contends that the FHAA does not apply because only a very small percentage of handicapped persons live in R&B houses. It supports this contention with statistics from certain government reports. New Jersey's assertion is controverted, however. In Finding of Fact ("FOF") 14, the district court found that a disproportionately high number of people in R&B houses have disabilities. See New Jersey Coalition of Rooming and Boarding House Owners v. Mayor and Council of the City of Asbury Park, Civ. No. 94-5134, at *5 (D.N.J. Jul. 8, 1997). Similarly in FOF 15, the district court cited legislative findings that R&B houses are occupied primarily by the elderly, disabled and poor. See id. And in FOF 16, the district court quoted several R&B owners who testified that most of their residents were disabled or otherwise unable to care for themselves. See id. The district court's finding that the FHAA applies here is thus supported in the record.

4

district court's standing determination so that the court may reach the merits of the remaining provisions, especially the "distance and density" provisions, which limit the number of new R&B houses that can be licensed in a municipality and cap the total number of R&B house residents to one-half of one percent of the total population of each municipality in New Jersey. For reasons that will appear, we conclude that the district court made insufficient factual findings for us to review its standing determination. Because there are several plausible theories upon which standing may exist, we will vacate and remand for further factual development and a new determination by the district court regarding plaintiffs' standing.

To fully review this case, we must also address a number of dispositive rulings on various aspects of plaintiffs' claims that would be controlling on remand. In particular, we examine the district court's decisions not to award plaintiffs compensatory damages, punitive damages, or counsel fees, and we highlight several statutory and constitutional claims that may require further consideration by the district court. In the end, we will reverse the district court's determination that it need not award compensatory damages once actual damages have been shown; we will affirm on the punitive damages issue because the district court's factualfinding that Neptune did not act outrageously or with reckless disregard for plaintiffs' federal rights is not clearly erroneous; and we will vacate and remand on the counsel fees issue for de novo consideration because of confusion surrounding certain procedural issues.

I.

The Act and Ordinances complained of here are the progeny of the Rooming and Boarding House Act of 1979, N.J. Stat. Ann. S 55:13B-1 et seq. ("RBHA") adopted by the New Jersey Legislature "to provide for the health, safety and welfare of all of those who reside in rooming and boarding houses in the State. . . ." N.J. Stat. Ann. S 55:13B-2. Specifically, the legislature found that because R&B house residents were predominately elderly, disabled, and poor, they required protection from building and safety hazards, as well as from unscrupulous and predatory neighbors and

owners. See id. To accomplish this, the RBHA requires any person who owns or operates an R&B house first to obtain a license from the Commissioner of the Department of Community Affairs (the "DCA"). See N.J. Stat. Ann. S 55:13B-7(a). It also provides standards to ensure that every R&B house is constructed in a manner that will protect the health, safety, and welfare of its residents while at the same time promoting a homelike atmosphere appropriate to such facilities. See N.J. Stat. Ann. S 55:13B-6. Those standards include, for example: safety fromfire; safety from structural, mechanical, plumbing and electrical deficiencies; adequate light and ventilation; physical security; protection from harassment, fraud, and eviction without due cause; clean and reasonably comfortable surroundings; the adequate rendering of personal and financial services in boarding houses; disclosure of owner identification information; and maintenance of orderly and sufficient financial and occupancy records. See id. To ensure compliance with these standards, the regulatory scheme provides for annual inspections by the State of all licensed R&B houses. See N.J. Stat. Ann.S 55:13B-9.

In December 1993, New Jersey enacted the Licensing Law, which gave the governing body of each municipality in New Jersey the option of assuming from the State the licensing responsibility for R&B houses. See N.J. Stat. Ann. S 40:52-10. Upon exercising that option, a municipality becomes responsible for ensuring compliance with State and local laws and therefore for protecting the health, safety, and welfare of the residents of those facilities. The Act requires that municipality to create an authority, in accordance with N.J. Stat. Ann. S 40:52-18, to assume the State's former duty of investigating applicants and their proposed R&B houses to determine, among other things, whether the facilities in question "are in compliance with all applicable building, housing, health and safety code regulations." N.J. Stat. Ann. S 40:52-13(a). Also, the licensing authority verifies that the applicant has never been convicted "of a crime involving moral turpitude, or any crime under any law of the State licensing or regulating a rooming and boarding house" and has never had its license revoked under the RBHA. N.J. Stat. Ann. S 40:52-13(b).

6

In early 1994, the Neptune Town Council, acting under the authority vested in it by the Licensing Law, adopted two Ordinances, Nos. 1658 and 1661, and assumed local control over R&B licensing in Neptune. Ordinance No. 1661 established a "Site Licensing Board" consisting of three persons and adopted virtually all of the essential elements of the Licensing Law. Ordinance No. 1658 required, among other things, that each R&B house owner secure a Certificate of Inspection prior to leasing, renting, or otherwise allowing the occupancy of any unit, room, or rental dwelling space within its facility.

II.

The district court found that a number of provisions of the Act and Ordinances violated the FHAA. The invalidated provisions had required: (1) R&B house owners to get Certificates of Inspection each time a new tenant occupied a room in their house; (2) public hearings before the Site Licensing Board would issue operating licenses to R&B house owners; (3) R&B house owners to secure bonding to cover relocation costs in the event that their R&B house was forced to close; and (4) applicants for site licensing to obtain zoning approvals for premises that had already been shown to have been properly zoned. See New Jersey Coalition of Rooming and Boarding House Owners v. Mayor and Council of the City of Asbury Park, Civ. No. 94-5134, at *34 (D.N.J. Jul. 8, 1997) ("District Court Opinion"). The district court found that these provisions were freighted with discriminatory intent, were unduly burdensome to plaintiffs, and that the Township had failed to make reasonable accommodations to allow handicapped persons to live in the residences and communities of their choice. See id. at 26-29. As we have observed, defendants have not appealed those aspects of the district court's order that invalidated portions of the Act and Ordinances.

With respect to the balance of their claims, however, the district court ruled against plaintiffs. Most notably, on the ground that plaintiffs lacked standing, the court did not reach their claims challenging the distance and density provisions of the Act. The district court also made several other rulings that are perforce before us now. The court

found that it had discretion to award compensatory damages but decided that this was an inappropriate case in which to exercise that discretion because the R&B owners (the only plaintiffs for whom the district court found any standing) were not members of the protected group of handicapped individuals. The district court also rejected plaintiffs' claims for punitive damages in view of its determination that defendants did not act with the requisite outrageousness and reckless disregard of plaintiffs' federal rights. Finally, the court failed to mention (and thus effectively denied) plaintiffs' request for counsel fees and costs as a prevailing party under the FHAA.

III.

As noted above, the district court refused to consider plaintiffs' challenges to the distance and density provisions of the Licensing Law on the grounds that plaintiffs lacked standing to assert them. The distance provision states that no license shall be issued for any R&B house when any part of the boundary line of any other R&B house is within 1,000 feet (in the case of a municipality with a population greater than 100,000, the standard may be increased to 2,000 feet). See N.J. Stat. Ann. S 40:52-14(c). The density section provides that no license shall be issued that would result in increasing the total number of persons authorized to be residents in R&B houses within the municipality to: (1) more than 100 in a municipality having a population of 20,000 or fewer, or (2) to more than one-half of one percent of the population in any other municipality. See N.J. Stat. Ann. S 40:52-14(b). Clearly, the evident purpose of both of these provisions is to permit municipalities to limit the number of R&B residents and/or homes within their borders. Plaintiffs assert that this scheme is as patently illegal as would be one that limited the number and/or housing options of members of an ethnic group within a particular municipality.

The ground upon which the district court found that plaintiffs lacked standing was that the Act and the Ordinances contained a "grandfather" clause that exempted all existing R&B homes from application of the distance and density provisions. See N.J. Stat. Ann.S 40:52-14(b) & (c)

8

("but nothing in this subsection shall warrant refusal of a license or license renewal for premises where a rooming or boarding house has been in lawful operation prior to the enactment of this act"). The court reasoned that there was, therefore, no way in which plaintiffs, all of whom are owners or residents of existing R&B homes in Neptune, could be harmed by these provisions. There are, however, a number of other possible bases under which plaintiffs could establish standing to challenge the distance and density provisions, but these have either been inadequatelyfleshed out in the record or lack sufficient factual findings by the district court to facilitate our review. While there is an extensive section of the district court's opinion labeled "Findings of Fact," in reality, the numbered "findings" are, for the most part, no more than recitations of various witnesses' testimony.

First, plaintiffs maintain that there has been a decline in the R&B housing stock in Neptune due to the distance and density provisions of the Act, and that it will therefore be difficult for disabled individuals to find lodging in the future. There is evidence in the record to this effect. For example, Ms. Andress testified that the Ordinances reduced the number of R&B houses in the community. See District Court Opinion, at *12. In addition, other evidence indicates that current R&B owners, despite the grandfather clauses, may have been detrimentally affected by the distance and density provisions. Notably, Mr. Mumford testified that his business volume and the financial rewards he could obtain decreased because of the Act, see id. at 11, and Ms. Andress opined that, although her R&B house was fully rented, the Act and Ordinances hurt her because the value of her property declined and consequently she could no longer sell her property and retire as planned. See id. at 13. Similarly, the Act and Ordinances preclude current owners from expanding their facilities into adjacent lots because only existing R&B houses are grandfathered. Finally, plaintiffs adduced evidence that they are harmed not only by the Act and Ordinances themselves, but also by the hostile manner in which defendants administered them. See id. at 12-13.

Although further factual development is necessary, the evidence and theories just described might be sufficient to

establish standing by the R&B owners and/or the resident plaintiffs to challenge the distance and density provisions of the Act. However, because these possible bases for standing may well be factually challenged and, at all events, have been inadequately fleshed out in the record and lack sufficient findings to facilitate our review, we will vacate the judgment of the district court and remand for further proceedings at which the plaintiffs will have the opportunity to attempt to establish standing in the first instance. If they succeed, the district court will then reach the merits.

IV.

A. Compensatory Damages

Although it granted relief on certain claims, the district court declined to award compensatory damages, which are said by plaintiffs to flow from emotional harm resulting from: (1) the distress to owners and residents caused by not knowing whether they would be forced to close or move, and (2) the distress to the residents caused by not being able to live in the housing units which they desired, and/or fearing they would have to leave a place that could accommodate their needs and in which they felt safe. Specifically, plaintiffs point to several findings of fact and conclusions by the district court that they claim demonstrate the intangible damages that they suffered. These include repeated public meetings in Neptune Township denouncing R&B houses (FOF 43); meetings between Neptune and state officials intended to reduce the number of deinstitutionalized in Neptune (FOF 28); the appointment of biased members to the Site Licensing Board (FOF 31), which caused owners and residents to live in fear of having their R&B houses closed by a "corrupted" local licensing system (FOF 35); and the adoption of onerous and unnecessary provisions designed to discourage R&B house owners from remaining in the community, such as mandating the fingerprinting of R&B house owners and requiring R&B owners to prove their pre-existing, non-conforming zoning status to retain their licenses (FOF 45, 38-40; Conclusion of Law 40). See District Court Opinion, at 8-12, 26.

10

Apparently, the district court believed that the FHAA conferred upon it the discretion to decide whether to award compensatory damages. See District Court Opinion, at *31 ("The plaintiff owners claim that they were harmed due to the distress caused by not knowing whether they would be forced to close. I find that such damages are not appropriate in this case. . . . Damages for emotional distress in discrimination cases are generally granted to the members of the protected group . . . . This rationale simply does not apply in this case . . . ."). This conclusion is understandable given the wording of the compensatory damage provision in the FHAA: "In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages," 42 U.S.C. S 3613(c)(1) (emphasis added), and the surprisingly sparse case law in this area.

While at first glance this language ("may award") appears discretionary, we decline to accept the district court's reading, and instead endorse the Ninth Circuit's thoughtful opinion in United States v. Hayward, which concluded that the compensatory damages provisions of the FHAA are mandatory.3 See United States v. Hayward, 36 F.3d 832, 839-40 (9th Cir. 1994). In Hayward, the Ninth Circuit relied on the Supreme Court's reasoning in Curtis v. Loether, 415 U.S. 189, 197 (1974), which found no discretion with respect to actual damages under a predecessor damages provision of the Fair Housing Act of 1968, 42 U.S.C. S 3610 et seq. ("FHA"), and the legislative history of the FHAA, which parroted the language of the old damage provision when it amended the FHA without making any substantial changes or mentioning the Curtis decision. In deciding that a party could demand a jury trial in a civil action under the FHA, a unanimous Supreme Court in Curtis had analyzed the formerS 3612, the predecessor damage provision to the one at issue here, and found that "if a plaintiff proves unlawful discrimination and

_____

3. Our discussion with respect to counsel fees, see infra S IV.C, is another example where statutory language that appears discretionary on its face has been construed in a such way as to restrict trial courts' judgment.

11

actual damages, he is entitled to judgment for that amount." Curtis, 415 U.S. at 197. The court based this conclusion upon its characterization of the claim as a legal claim for damages, rather than an equitable claim for restitution. See id.

As the Ninth Circuit points out, when Congress amended the FHA in 1988 and replaced the damage provision at issue in Curtis with S 3613, it did not substantially change any language therein, nor did it indicate any displeasure with the Curtis decision. The former S 3612(c) provided: "The court . . . may award to the plaintiff actual damages and not more that $1,000 punitive damages . . . ." The new S 3613(c) provides: "[T]he court may award to the plaintiff actual and punitive damages . . . ." The wording in the amended damage provision is virtually identical to old language except that Congress eliminated the $1,000 cap on punitive damages. The legislative history of the new enforcement provisions in the FHAA confirms this reading:

> Section [3613(c)] provides for the types of relief a court may grant. This section is intended to continue the types of relief that are provided under current law, but removes the $1,000 limitation on the award of punitive damages. The Committee believes that the limit on punitive damages served as a major impediment to imposing an effective deterrent on violators and a disincentive for private persons to bring suits under existing law.

H.R.Rep. No. 711, 100th Cong., 2d Sess., 39-40 (1988), reprinted in, 1988 U.S.C.C.A.N. 2173, 2200-01 (footnotes omitted). On the basis of this language and the unanimous mandate of the Supreme Court, we agree with the Ninth Circuit that "Congress did not intend the courts to have discretion to award actual compensatory damages if a party has actual damages," for if it did, "it would have changed the language of the new damages provisions when it enacted the 1988 Amendments." Hayward, 36 F.3d at 839. Thus, "if a party proves actual damages, a district court's award of compensatory damages is mandatory, not discretionary." Id.

Defendants advance several alternative arguments in the

event that we were to conclude, as we have, that the award of damages under S 3613(c)(1) is mandatory. First, they contend, and the district court held, that damages for emotional distress should only be available to the deinstitutionalized, and not to the R&B owners, because the owners are not members of a protected group under the FHAA. We find nothing in the statute, however, that distinguishes between handicapped plaintiffs and those who are not. The statute directs that the court "may award to the plaintiff actual and punitive damages."[4] 42 U.S.C. S 3613(c)(1) (emphasis supplied). Given that S 3613(c)(1) requires the district court to award damages if they are proven, we see no basis in the language or history of the statute to carve out groups of legitimate plaintiffs to which S 3613(c)(1) does not apply (and defendants have not identified any precedent to the contrary).

We find support for this conclusion in United States v. Scott, 809 F. Supp. 1404, 1406-07 (D. Kan. 1992), where the court permitted the seller of a home intended to be used as a group home for physically and mentally handicapped adults to sue as an "aggrieved person" under the FHAA and to recover actual compensatory damages for emotional distress based upon specific instances of "cool treatment and social shunning" by the defendants. Therefore, should plaintiffs ultimately prevail on remand over defendants' alternative positions discussed next (as well as on the distance and density provisions if they can establish standing), the district court will be required to calculate damages.

Defendants also make several fact-based arguments why compensatory damages are not warranted here. For example, defendants claim that there is not enough evidence of emotional distress related to actions taken by Neptune officials (as opposed to the Ocean Grove

_____

4. 42 U.S.C. S 3604(f)(2) declares that it is unlawful "to discriminate against any person in the terms, conditions, or privileges of sale or rental
of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of -- (A) that person; . . . or (C) any person associated with that person." Thus, under the FHAA, plaintiffs can be both handicapped and non-handicapped individuals.

Homeowners Association) to justify compensation.
Defendants also urge that, because plaintiffs ultimately
received their licenses and zoning approvals, they could not
possibly have suffered emotional distress due to defendants'
discriminatory practices which only threatened their
livelihoods. Finally, defendants contend that, because the
Department of Community Affairs could have closed down
the R&B houses for legitimate violations prior to the
passage of the Act and Ordinances, any argument by
plaintiffs that they suffered emotional distress based upon
the threat of closure by the Site Licensing Board after
passage of the Act and Ordinances is unavailing. These
arguments may in fact prevail, and plaintiffs' damage
claims may prove ephemeral. However, given the district
court's erroneous conclusion that it had discretion under
S 3613(c)(1) to decide whether to award damages, these
arguments should be considered by the district court on
remand.

B. Punitive Damages

The district court also declined to award punitive
damages. In so doing, the court concluded that defendants
were not motivated by "evil motive or intent" and did not
act with the requisite outrageousness and reckless
disregard of plaintiffs' federal rights to justify an award of
punitive damages. See District Court Opinion, at *32. As
factual findings, we review these conclusions to determine
if they are clearly erroneous. See Anderson v. Bessemer
City, 470 U.S. 564, 573 (1985). Under this narrow review,
we cannot disturb the district court's determination.
Furthermore, it is not clear that punitive damages can ever
be awarded against a municipal defendant. See Newport v.
Fact Concerts, Inc., 453 U.S. 247, 267 n.29 (1981) ("It is
perhaps possible to imagine an extreme situation where
taxpayers are directly responsible for perpetrating an
outrageous abuse of constitutional rights."). We agree with
the district court that, if they can be, they are not
warranted here. That is because plaintiffs have not adduced
evidence of the "widespread and knowledgeable
participation by the taxpayers" sufficient to meet the
Supreme Court's Newport exception. See Heritage Homes of

14

Attleboro, Inc. v. Seekonk Water Dist., 670 F.2d 1, 2 (1st
Cir. 1982).

C. Counsel Fees

The district court failed to address plaintiffs' motion for
counsel fees and costs to which, as the prevailing party,
they were entitled under 42 U.S.C. S 3613(c)(2).5 As with
S 3613(c)(1), this provision, which sounds fully
discretionary -- "the court, in its discretion, may allow the
prevailing party, other than the United States, a reasonable
attorney's fee and costs" -- actually is not. 42 U.S.C.
S 3613(c)(2) (emphasis supplied). In fact, a district court's
discretion not to grant attorney's fees and costs in civil
rights cases is tightly cabined. See Newman v. Piggie Park
Enters., Inc., 390 U.S. 400, 402 (1968) ("It follows that one
who succeeds in obtaining an injunction under that Title
should ordinarily recover an attorney's fee unless special
circumstances would render such an award unjust."); see
also Blanchard v. Bergeron, 489 U.S. 87, 89 n.1 (1989);

_____

5. Section 3602(o) provides that " `Prevailing Party' has the same meaning
as such term has in section 1988 of this title." Defendants contend that
plaintiffs were not a "prevailing party" for the purposes of the FHAA.
They argue that, although plaintiffs have won, they have obtained only
de minimis relief in comparison with what they sought. For example,
defendants argue that while plaintiffs have gotten certain parts of the
Act
and Ordinances enjoined, they sought a permanent injunction barring
enforcement of the Act and Ordinances in their entirety. Thus, with
respect to "their real goal," defendants contend that plaintiffs suffered
"total defeat." We find no merit to this argument. Plaintiffs have easily
satisfied the "prevailing party" standards set forth in Metropolitan
Pittsburgh Crusade for Voters v. Pittsburgh, 964 F.2d 244, 250 (3d Cir.
1992). Namely, plaintiffs " `achieved some of the benefit sought by the
party bringing the suit' " and the " `litigation constituted a material
contributing factor in bringing about the events that resulted in
obtaining the desired relief.' " Id. (quoting Dunn v. United States, 842
F.2d 1420, 1433 (3d Cir. 1988)). Indeed, the relief realized by plaintiffs
to this point is far from de minimis, and upon remand, they may be
successful in invalidating even more of the Act and Ordinances. Of
course, the district court will have to determine, consistent with Hensley
v. Eckerhart, 461 U.S. 424, 436 (1983), whether plaintiffs' counsel fee
request should be reduced because plaintiffs only achieved partial
success.

15

Hatfield v. Hayes, 877 F.2d 717, 719 (8th Cir. 1989); DiFilippo v. Morizio, 759 F.2d. 231, 234 (2d Cir. 1985); Leeds v. Watson, 630 F.2d 674, 677 (9th Cir. 1980); David v. Travisono, 621 F.2d 464, 468 (1st Cir. 1980); Robinson v. Kimbrough, 620 F.2d 468, 474 (5th Cir. 1980); Bonnes v. Long, 599 F.2d 1316, 1318 (4th Cir. 1979).6 The district court did not find any "special circumstances" justifying its decision not to award attorney's fees and costs (in fact, it offered no explanation whatever), and we find none.

That being said, we cannot direct an award of counsel fees because the procedural history surrounding this aspect of the case is murky. Plaintiffs included a request for counsel fees and costs in the prayer for relief of their complaint. On July 8, 1997, the district court entered a judgment in favor of plaintiffs on several issues, against them on others, that simply did not mention plaintiffs' request for attorneys fees and taxed costs. On July 22, 1997, plaintiffs filed a timely Notice of Appeal appealing from "the final judgment entered in this action on the 8th day of July, 1997." App. at iii. On July 29, 1997, twenty-one days after the judgment was entered, plaintiffs filed a timely "Motion for Relief From Judgment or Order,

_____

6. In Piggie Park, the Supreme Court was interpreting the fee-shifting language contained in S 204(b) of the Civil Rights Act of 1964, 42 U.S.C. S 2000a–3(b). In the other cases cited above, the courts were interpreting similar language found in 42 U.S.C. S 1988. The language in both S 204(b) and S 1988 is almost identical to the language at issue here, and under Independent Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 758–59 & n.2 (1989) (citation omitted), we are directed that "fee-shifting statutes' similar language is `a strong indication' that they are to be interpreted alike." See also Bell v. United Princeton Properties, Inc., 884 F.2d 713, 719 (3d Cir. 1989) (applying the same standards for sua sponte reductions in attorneys' fees requests in ERISA cases as apply in civil rights cases); Delaware Valley Citizens' Council for Clean Air v. Pennsylvania, 762 F.2d 272, 275 (3d Cir. 1985) (applying same standards for setting "reasonable" attorney's fees under the Clean Air Act as apply under S 1988), modified on other grounds, 478 U.S. 546 (1986), rev'd on other grounds, 483 U.S. 711 (1987). Therefore, we believe that the standard enunciated in Piggie Park and Blanchard regarding the extent of the district court's discretion to award a prevailing party counsel fees is the proper one to apply to cases brought under the FHAA.

16

Pursuant to [Fed. R. Civ.] Rule 60, and Motion to Tax Costs, Including Attorney Fees, Pursuant to [N.J. Civ.] Local Rule 54.1." In paragraphs 10 through 12 of his certification accompanying these motions, plaintiffs' counsel stated (underscoring in original):

> I called the Clerk to discuss the taxing of costs under these circumstances. I inquired as to the manner of filing the motion to reform the judgment and obtain attorney fees in light of the 3 day return in [N.J. Civ.] Rule 54.1. Obviously the Clerk would not be entitled to reform a judgment or to assess attorney fees.
>
> I was instructed to submit a Bill of Taxed Costs on the presumption that if the judgment was silent, it was intended that costs should be awarded to the prevailing party, and make the motion for the remainder of the relief to the Court.
>
> I have proceeded in this fashion, therefore, filing this motion pursuant to [Fed. R. Civ.] Rule 60  and Rule 54.1 of the local rules, for costs, including attorney fees, which I believe to be appropriate pursuant to 42 U.S.C. S 3613(c)(2), to be read in conjunction with 42 U.S.C. S 1988.

The district court denied these motions on October 6, 1997.

It appears to us that plaintiffs filed a viable (and timely) petition for counsel fees pursuant to N.J. Civ. R. 54.1 within 30 days of the judgment.7 However, when the matter came before Judge Brown, to whom the case was assigned following the death of Judge Fisher, the only issue that was apparently presented to him was the question whether Judge Fisher had intentionally or inadvertently left counsel fees and costs out of the judgment. Judge Brown concluded that the omission was deliberate, and he consequently

_____

7. It is not clear to us whether plaintiffs should have moved for counsel fees under Local Rule 54.1, "Costs", or Local Rule 54.2, "Compensation for Services Rendered and Reimbursement of Expenses," and the issue has not been briefed. At all events, it was clear from the face of the motion what plaintiffs were seeking, so to the extent that they may have mislabelled their motion, any mistake is of no moment.

17

denied plaintiffs relief under Rule 60. In his judgment, delivered from the bench, Judge Brown concluded:

> It seems to me that a Rule 60 motion clearly does not lie here. There is no evidence whatsoever of any clerical mistake, rather the order and the findings and conclusions are clear, except to the very limited extent set forth therein; the plaintiff's request for relief was denied and judgment was entered for the defense.

From these statements, it appears that Judge Brown only considered the Rule 60 motion, and not the Local Rule 54.1 motion, which was timely filed and properly before the court. Moreover, it is possible that plaintiffs will prevail on additional claims in light of our discussion with regard to their standing to challenge the distance and density provisions, and hence the district court may have to consider counsel fees and costs on those issues in the future.

Given the foregoing circumstances, we think that the best approach is to send back this entire matter for reconsideration of the Local Rule 54.1 motion. This disposition will not prejudice defendants because plaintiffs' fee request was included in their complaint and was preserved in their Notice of Appeal filed on July 22, 1997.

D. Statutory and Constitutional Claims

Assuming plaintiffs can establish standing upon remand, the district court will have to consider several troubling aspects of the Act and Ordinances, most notably the distance and density provisions contained in N.J. Stat. Ann. S 40:52-14. If standing is established, the district court will have to determine whether these provisions violate the FHAA, the United States and New Jersey constitutions, and the NJLAD.8 Of course, the court will

---

8. While plaintiffs contend that the Licensing Act and Ordinances were the result of a malicious, five year effort by defendants to reduce the number of mentally handicapped in Neptune to an "acceptable" number and therefore served no cognizable interest under the FHAA or the United States and New Jersey constitutions, we are satisfied that the

18

take up the statutory claims first and may not have to reach the constitutional issues. As noted above, plaintiffs contend that the distance and density provisions were motivated by discriminatory animus and are unduly burdensome on the deinstitutionalized who wish to live in the residences and communities of their choice. They further submit that the Township has not attempted to reasonably accommodate them as required under the FHAA and has offered no rational basis or legitimate government

_____

state and local defendants have established a valid justification for the overall regulatory scheme -- namely, to promote the health and safety of R&B residents, many of whom require state protection. We therefore reject plaintiffs' argument that the Act and Ordinances must be rejected in toto because they were the product of discriminatory intent.

Moreover, since the FHAA provides for the severability of statutes, see 42 U.S.C. S 3615 ("[A]ny law of a State. . . that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid.") (emphasis supplied), the district court properly examined each provision of the Act and Ordinances separately when determining whether there were any statutory violations. Likewise, a review of New Jersey law indicates that ordinances and statutes should be preserved against constitutional or other attack to the greatest extent possible. See N.J. Stat. Ann. S 1:1-10 ("If any title, subtitle, chapter, article or section of the Revised Statutes, or any provision thereof, shall be declared to be unconstitutional, invalid or inoperative, in whole or in part, by a court of competent jurisdiction, such title, subtitle, chapter, article, section or provision shall, to the extent that it is not unconstitutional, invalid or inoperative, be enforced and effectuated, and no such determination shall be deemed to invalidate or make ineffectual the remaining titles, subtitles, chapters, articles, sections or provisions"); Barone v. Department of Human Services, 526 A.2d 1055, 1063 (N.J. 1987) (power to declare statutes void must "be delicately exercised"); see also New Jersey v. Patton, 607 A.2d 191, 194 (N.J. Super. Ct. App. Div. 1992) (if necessary, a court " `may engage in a judicial surgery to excise a constitutional defect or engraft a needed meaning.' ") (citation omitted), rev'd on other grounds, 627 A.2d 1112 (N.J. 1993); Gilman v. Newark, 180 A.2d 365, 386-87 (N.J. Super. Ct. Law. Div. 1962) (when provisions of an ordinance are severable, the invalidity of the severable parts does not render the entire ordinance invalid). Therefore, contrary to plaintiffs' contention, the Act and Ordinances do not rise or fall together -- the district court properly analyzed each section separately.

19

interest served by "declustering" the deinstitutionalized. Although the merits are not properly before us, we note that provisions similar to these have already been struck down under the FHAA based upon many of the same factual findings that the district court in this case has already made with respect to the portions of the Act and Ordinances on which it found that plaintiffs had standing. See e.g., ARC of New Jersey, Inc. v. New Jersey, 950 F. Supp. 637 (D.N.J. 1996); Association for Advancement of the Mentally Handicapped, Inc. v. Elizabeth, 876 F. Supp. 614 (D.N.J. 1994); Horizon House Developmental Serv's, Inc. v. Township of Upper Southampton, 804 F. Supp. 683, 693–95 (E.D. Pa. 1992).9

Insofar as the plaintiffs continue to challenge the remainder of the provisions of the Act and Ordinances, we

_____

9. In Horizon House, the court determined that a township ordinance that imposed a distance requirement of 1,000 feet between group homes for mentally retarded people was facially invalid under the FHAA regardless of the motive of the drafters, and even if it incidentally affected some unrelated groups of non-disabled individuals such as juveniles and ex-criminal offenders. See Horizon House, 804 F. Supp. at 694. The court rejected the Township's rationale that "declustering" promoted integration into the community and was thus benign. See id. at 695. In addition, the Horizon House court found discriminatory intent on the part of the Township based upon animus similar to that found by the district court in this case. See id. at 696 (determining that the ordinance was passed in "response to community opposition and to outmoded fears about people with mental retardation").

The Horizon House court also concluded that the challenged ordinance had a discriminatory effect which would have been grounds for invalidation even if it were not facially invalid or the product of discriminatory intent. See id. at 697. The discriminatory effects found by the court were that the spacing requirement limited the number of people with disabilities who could live within the Township, limited their choices on where to live, limited their access to essential community resources, and thwarted efforts to treat people with handicaps equally in the community thereby negatively affecting their self-esteem. See id.

Finally, the court in Horizon House determined that the spacing requirement failed to provide persons with disabilities with a reasonable accommodation because it was a blanket and categorical rule under which the process of obtaining variances was lengthy, costly, and burdensome. See id. at 700.

20

consider them to be unexceptional, and find that they were properly upheld by the district court, including sections that: (1) permit municipalities to license R&B houses locally in the place of the Department of Community Affairs, see N.J. Stat. Ann. S 40:52-10; (2) require a licensing fee and provide for the submission of information and supporting documentation so the licensing authority can conduct an investigation of the applicant, see N.J. Stat. Ann. S 40:52-12; (3) provide for the inspection of R&B house premises for health and safety violations, and prohibit ownership of R&B houses by persons convicted of crimes of moral turpitude, see N.J. Stat. Ann. S 40:52-13; (4) provide for the term of the licenses, see N.J. Stat. Ann. S 40:52-15; (5) provide when licenses may be revoked, see N.J. Stat. Ann. S 40:52-16, (6) provide for appeals to the Department of Community Affairs and Appellate Division of the New Jersey courts in the event of a revocation of a license, see N.J. Stat. Ann. S 40:52-17; and (7) establish the requirements for municipal licensing authorities, see N.J. Stat. Ann. S 40:52-18.

As the district court concluded, none of these provisions is unduly burdensome on plaintiffs, and they do not violate the FHAA. Their essential impact is to shift the oversight and enforcement of R&B houses from the state to local level. Similar provisions for licensing, inspections, revocation, et cetera, existed under the state-administered regime, and we will not invalidate provisions of a statute whose only effect is to authorize local communities to assume an enforcement role at their election -- even if there was discriminatory animus behind the legislation -- without some evidence that the provisions were unduly burdensome. In addition, the provisions are rationally related to the government's legitimate purpose of protecting the mentally ill and aged who live in R&B houses, and thus they do not violate either the United States or the New Jersey constitutions.

Finally, we note that N.J. Stat. Ann. S 40:52-13(d), which requires each owner of a R&B house to establish a "sufficient guarantee of financial and other responsibility to assure appropriate relocation of the residents of the rooming or boarding house to suitable facilities in the event

21

that the license is subsequently revoked or its renewal denied," also seems problematic under the FHAA and possibly the United States and New Jersey constitutions. As with the bonding provision in Neptune Ordinance 1661, this was inadequately briefed and explained to both the district court and to us; we simply highlight it for scrutiny on remand.

For the foregoing reasons we will affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. Parties to bear their own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit